**Katherine SABATINO, Plaintiff,**

v.

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, et al., Defendants.**

**No. C 02–1891 CW.**

United States District Court, N.D. California.

Sept. 16, 2003.

---

ORDER ON PARTIES' CROSS–
MOTIONS FOR SUMMARY
JUDGMENT

WILKEN, District Judge.

Plaintiff Katherine Sabatino and Defendants Liberty Life Insurance Company of Boston (Liberty) and McKesson Corporation (McKesson) have filed cross-motions for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure. The parties have also moved in the alternative for summary adjudication of numerous issues. The matter was heard on April 18, 2003. After considering all the papers filed by the parties, including the parties' supplemental briefs, and oral argument on the motions, the Court DENIES Defendants' motion and GRANTS in part Plaintiff's motion.

## BACKGROUND [1]

Plaintiff challenges Liberty's decision to deny her application for long-term disability benefits under the employee welfare benefits program of McKesson, her employer. Plaintiff claimed long-term disability benefits based on a hip condition. Liberty denied her claim because of an exclusion for pre-existing conditions and

disputes that she is disabled. At issue is Plaintiff's effective date of coverage under the policy, because the pre-existing condition exclusion provision of the policy applies only to disabilities that begin in the first twelve months of an employee's coverage. This depends upon whether Plaintiff was actively at work within the meaning of the policy when the policy went into effect.

Plaintiff began employment with McKesson as an engineer in 1994. CF–352. In October, 1999, McKesson offered short and long term disability benefits to its employees, including Plaintiff, pursuant to a new group long term disability (LTD) income policy, number GF3–860–038934–01. Coverage would begin on January 1, 2000 for employees actively at work on that date. CF–429. The LTD plan was administered and underwritten by Liberty. P–1, CF–409. Liberty also administered McKesson's self-insured short term disability (STD) policy. On October 29, 1999, Plaintiff pre-enrolled in the LTD plan. CF–429.

The LTD policy states:

An Employee will be considered actively at work if he was actually at work on the day immediately preceding: . . . any excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off);

P–5. The policy provides that where an enrolled employee is not on active employment as of the effective date (January 1, 2000 for then-current employees), that employee's effective date of coverage is delayed until the date active employment begins. *See* P–7, 11, 13.

1. Except where otherwise noted, the following facts are undisputed and are taken from the group disability income policy administered by Liberty, Declaration of Paula McGee, Ex. A (Docket No. 20–5) and Plaintiff's claim

file maintained by Liberty, McGee Decl., Ex. B (Docket No. 20–5). Hereinafter, page citations to the policy and claim file will be abbreviated as, P-[page number] and CF-[page number], respectively.

As relevant to this case, the policy defines disabled as "unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness." P–5.

"Pre–Existing Condition" is defined as "a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received treatment within three months prior to the Covered Person's Effective Date." P–25.

The policy exclusion for pre-existing conditions states:

This policy will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from a Pre–Existing Condition; and

2. which begins in the first 12 months after the Covered Person's Effective Date.

*Id.*

The policy provides discretion to Liberty to construe the policy and determine benefits:

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

P–29.

Sometime in 1999, Plaintiff asked McKesson for "Family/Employee Medical Leave." She submitted a leave request to McKesson by completing a one-page physician's certification, on a form supplied by McKesson. The form, completed on September 20, 1999 by Plaintiff's physician, Alison Jacoby, states that the leave would run "From: 12/30/99 To: 3/15/99." Apparently, March 15, 2000 was the ending date actually intended. The form required the physician or practitioner completing the form to check one of five categories. Dr. Jacoby checked the second category, indicating that Plaintiff was entitled to leave because of

Continuing treatment for prenatal care and/or a chronic or long-term health condition that is incurable or so serious that if not treated would likely result in a period of incapacity for four or more calendar days.

The second category was the only category that included prenatal care. The form included no separate category for maternity leave or prenatal care only. The form also included several blank lines in which the physician completing the form was to describe the "[r]egimen or treatment to be prescribed." Dr. Jacoby left these lines blank. CF–445. Plaintiff claims that this leave was for pregnancy and maternity.

Plaintiff also claims that, consistent with this form, her leave began on December 30, 1999, and that she did not take a leave beginning December 1, 1999. In her declaration, Plaintiff states that she worked for McKesson through December 30, 1999. Attached to Plaintiff's declaration are bank and credit union statements showing direct deposits made to her accounts by McKesson on December 3, 17 and 30, 1999. Sabatino Decl., Ex. A. Plaintiff also states that she attended a continuing education class in San Francisco in mid-December, 1999, which was paid for by McKesson. Sabatino Decl. ¶ 5, Ex. B.

Defendants contend that Plaintiff took a "short term disability" leave for her hip condition beginning on December 1, 1999, and ending on May 30, 2000. CF–467. Defendants rely for this contention on a "recap" in Liberty's file prepared by McKesson's human resources department. *Id.* However, a separate, undated, unsigned handwritten note included elsewhere in Liberty's claim file states, inter alia:

"Maternity 12/1/99 DOD—Maternity 6/30/00 RTW" CF–17. This note apparently indicates that Plaintiff began maternity leave on December 1, 1999 and returned to work on June 30, 2000. It is thus inconsistent with the recap.

Defendants dispute Plaintiff's claim that she was at work the day before her leave began, but offer no other evidence that she was not at work on December 29, 1999. They offer no evidence that she was not at work on November 30, 1999.

On February 10, 2000, Plaintiff gave birth to a son. CF–429. She apparently did not return to work on March 15 or on May 30, but on May 31, 2000, she began a second leave. CF–467. Plaintiff returned to work at McKesson on July 1, 2000. CF–467.

On October 3, 2000, Plaintiff began a short term disability leave for surgery to correct her congenital hip dysplasia. Plaintiff had been diagnosed with bilateral developmental dysplasia of her hips at age two. CF–38. The surgery, involving total hip replacement, took place on October 12, 2000. CF–429–30. Plaintiff returned to work on February 13, 2001. CF–467.

On March 27, 2001, Plaintiff saw Marci Gottlieb, M.D., reporting persistent hip and groin pain. CF–324. Dr. Gottlieb completed an attending physician's statement making a diagnosis of left hip and groin pain and noted that Plaintiff required a higher dosage of pain medication to manage her symptoms. CF–392.

On April 2, 2001, Plaintiff stopped work, claiming that chronic hip pain and cognitive impairments caused by pain medication prevented her from working. Plaintiff claims that without the medication her pain is debilitating and that the medication, including Vicodin and Neurontin, makes it impossible to concentrate and perform her job duties. CF–430.

Plaintiff submitted a claim for short term disability (STD) benefits on April 18, 2001, which was approved by Liberty with an effective date of April 2, 2001. CF–385.

On April 25, 2001, Plaintiff saw Robert Gilbert, M.D., still complaining of pain. Dr. Gilbert noted an excellent range of motion and equal leg lengths, but pain with flexion. CF–47. The results of a bone scan ordered by Dr. Gilbert on May 24, 2001 and completed on August 3, 2001 revealed normal postoperative changes and no evidence of skeletal pathology. CF–42.

On May 16, Plaintiff saw David W. Lowenberg, M.D. Dr. Lowenberg's report states that his examination of Plaintiff's x-rays showed that the implant was in excellent position with no signs of loosening. Dr. Lowenberg described Plaintiff as "distraught as she is still having significant pain." Dr. Lowenberg explained that "sometimes a total hip can continue to hurt despite what is done." CF–46.

On June 5, 2001, Dr. Gottlieb sent Liberty a completed restrictions form noting Plaintiff's inability to sit, stand or walk for prolonged periods and noting Plaintiff's inability to concentrate due to high dosages of pain medication. CF–375. On July 6, 2001, Dr. Gottlieb sent Liberty a completed functional capacities form describing Plaintiff's physical limitations. CF–370. On July 26, 2001, Dr. Gottlieb extended Plaintiff's disability to November 1, 2001, noting her "constant pain." CF–355.

On September 20, 2001, Liberty informed Plaintiff that she would have received the maximum twenty-six weeks of STD benefits on September 30, 2001 and would be contacted by Liberty to discuss LTD benefits. CF–353.

According to Liberty's claim note 9, dated December 12, 2001, Liberty employee Vee Mains initially approved Plaintiff's claim for LTD benefits, noting the func-

tional limitations caused by high dosages of pain medication. Claim note 9 further stated: "PRE–EX [pre-existing condition] NOT AN ISSUE .. EE'S DATE OF HIRE IS 11/14/94." CF–2 (ellipses in original).

According to claim note 11, a manager review note dated December 13, 2001, N. Chandra "AGREE[D] THAT DUE TO MEDICATIONS EE WOULD BE DISABLED—REVIEW OF INFORMATION FROM ICASEMANAGER [sic] REVEALS THAT THE MEDS NEURONTIN AND VICODIN BOTH CAUSE DROWSINESS AND FATIGUE AND CLOUDED THINKING." However, Chandra further stated that an eligibility screen showed Plaintiff's effective date for LTD coverage was July 1, 2000. For this reason, and because Plaintiff's disability began in April, 2001, less than twelve months after this July 1, 2000 effective date of coverage, Chandra stated that a pre-existing condition investigation had to be conducted. CF–2.

Claim note 13, prepared by Vee Mains and dated December 13, 2001, states: "ACCORDING TO ER .. THIS EE IS AUTOMATICALLY ENROLLED INTO BASIC LTD CORE—EFFECTIVE DATE IS 02/01/1995." CF–3 (ellipses in original).

An undated McKesson data entry form contained in Liberty's file lists July 1, 2000 as the "Coverage Begin Date" for all of Plaintiff's health and disability coverage, including LTD. An unsigned handwritten note on this form states: "employee returned from leave eff 6/30/00—grandfathered for Life + LTD—please update! Thanks." CF–13.

On January 4, 2002, Plaintiff's claim file was transferred to a different Liberty case manager, Liz Swirka. CF–3. As of that time, Liberty had not issued Plaintiff any LTD benefits or made a final determination regarding her claim. CF–6.

According to claim note 24, dated January 7, 2002, Swirka informed Plaintiff that Liberty "DID RECEIVE AN ENROLLMENT FORM WHICH DOES RULE OUT PRE–X [pre-existing condition]." However, Swirka stated in the claim notes that "THIS CM DOES NOT SEE OBJECTIVE MEDICAL TO SUPPORT [PLAINTIFF'S] INABILITY TO DO SEDENTARY WORK." CF–4. According to claim note 30, dated January 23, 2002, Swirka discussed policy provisions regarding the pre-existing condition exclusion with Plaintiff. CF–6.

In February, 2002, Plaintiff retained counsel. In February, March and April, 2002, Plaintiff's counsel contacted Liberty to obtain her claim file and information regarding the status of her claim. Declaration of Matthew B. Weber ¶¶ 2–6 (Docket No. 23). Plaintiff filed her complaint in this case on April 18, 2002. As of that date, Liberty had not issued a decision regarding Plaintiff's claim. In her complaint, Plaintiff asserts claims for declaratory and equitable relief based on Defendants' improper denial of benefits and violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132.

In a letter dated April 30, 2002, Swirka informed Plaintiff's counsel that Liberty had determined that benefits were not payable. Swirka's letter stated that because Plaintiff's effective date of coverage for benefits was July 1, 2000, according to a McKesson benefits enrollment form, and her disability began less than one year later, on April 2, 2001, a pre-existing condition investigation was conducted for the three months prior to her effective date, the period from April 1, 2000 through June 30, 2000. Swirka stated that medical and pharmacy records for that period indicated that Plaintiff had sought treatment during that period for the hip condition on which

her claim for LTD benefits was based. CF–21–23.

On June 27, 2002, Plaintiff, through counsel, submitted a request for an appeal of Liberty's decision denying Plaintiff's claim.

Liberty procured a September 16, 2002 medical opinion by Gale G. Brown, Jr., M.D., who concluded on review of Plaintiff's medical records that Plaintiff was not disabled. Dr. Brown's opinion stated that Plaintiff "has been on narcotic medications chronically at least to 1999, despite which [Plaintiff] worked for years." Elsewhere, Dr. Brown's medical opinion stated that Plaintiff took Tylenol with codeine in November, 1999 but did not describe the amount or frequency of dosage. According to Dr. Brown's medical opinion, Plaintiff did not take Vicodin until February, 2001. CF–416–23.

In a letter dated September 23, 2002, Kathleen M. Malia informed Plaintiff's counsel that, based on a review of the claim file, Liberty had determined that its previous decision to deny Plaintiff LTD benefits on the basis of a pre-existing conclusion was correct. Malia further stated that Plaintiff's medical records were reviewed by Dr. Brown, who concluded that Plaintiff was able to "return to the requirements of a sedentary occupation." CF–409–14.

## DISCUSSION

I. Legal Standards for Summary Judgment and Summary Adjudication

Summary judgment, or summary adjudication, is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisen-*

*berg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir.1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Eisenberg*, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. *Id.; see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden

then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan*, 929 F.2d at 1409. A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a *prima facie* showing in support of its position on that issue. *See UA Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir.1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *See id.; see also Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir.1991). Once it has done so, the non-moving party must set forth specific facts controverting the moving party's *prima facie* case. *See UA Local 343*, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." *Id.* This standard does not change merely because resolution of the relevant issue is "highly fact specific." *See id.*

■ In ERISA cases, as is the usual rule, the existence of a material factual dispute precludes summary judgment. *See Tremain v. Bell Industries, Inc.*, 196 F.3d 970, 978 (9th Cir.1999). In that case, to evaluate Plaintiff's claim, the Court must conduct, pursuant to Rule 52, Federal Rules of Civil Procedure, a bench trial based on the administrative record and such other evidence as the Court admits. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir.) (en banc) *cert. den.* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999).

## II.   Parties' Motions

### A.   ERISA Standard of Review

■ ERISA provides Plaintiff with a federal cause of action to recover the benefits she claims are due under the Plan. 29 U.S.C. § 1132(a)(1)(B). The standard of review of a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan. Absent contrary language in the plan, the denial is reviewed under a *de novo* standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). However, if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," an abuse of discretion standard is applied. *Id.; Taft v. Equitable Life Assurance Society*, 9 F.3d 1469, 1471 (9th Cir.1993). Where discretionary authority has been granted to the plan administrator, the Ninth Circuit has applied an "arbitrary and capricious" standard in determining whether the plan administrator abused its discretion. *McKenzie v. General Telephone Co. of California*, 41 F.3d 1310, 1314 (9th Cir.1994); *Taft*, 9 F.3d at 1471, n. 2 (use of the term "arbitrary and capricious" versus "abuse of discretion" is a "distinction without a difference").

Here, the plan grants Liberty discretion to interpret the policy, as well as the power to decide eligibility for benefits. Because the plan grants Liberty this discretionary authority, an arbitrary and capricious or abuse of discretion standard should be applied, unless a conflict of interest triggers the less deferential standard. *See, e.g., Taft*, 9 F.3d at 1471.

■ If "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of

discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948. For example, where the plan administrator is also the beneficiary's employer, the Court may impose "a more stringent version of the abuse of discretion standard." *Taft,* 9 F.3d at 1474. In analyzing this conflict of interest, the Ninth Circuit has stated that it will

> ultimately apply a traditional abuse of discretion standard to the decisions of apparently conflicted employer- or insurer-fiduciaries unless the affected beneficiary comes forward with further evidence indicating that the conflicting interest caused a breach of the administrator's fiduciary duty to the beneficiary.

*Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1322–23 (9th Cir.1995). To invoke the less deferential standard, the beneficiary must provide material, probative evidence, beyond the mere fact of the apparent conflict, that tends to show that the administrator's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary. *Id.* at 1323. Where the beneficiary meets this burden, this

> creates a rebuttable presumption that the plan's decision was in fact a dereliction of its fiduciary responsibilities. The plan then bears the burden of rebutting the presumption by producing evidence to show that the conflict of interest did not affect its decision to deny or terminate benefits. If the plan fails to carry its burden, then [the Court will] review de novo its decision denying benefits.

*Regula v. Delta Family–Care Disability Survivorship Plan,* 266 F.3d 1130, 1145 (9th Cir.2001) *judgment vacated on other grounds* — U.S. —, 123 S.Ct. 2267, 156 L.Ed.2d 109 (2003).

The Ninth Circuit has provided a short list of the kinds of evidence a beneficiary may provide in order to make a prima facie showing of a breach of fiduciary duty. These include: "inconsistency in the administrator's dealings with the beneficiary," *Regula* 266 F.3d at 1146 (citing *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.,* 125 F.3d 794, 797 (9th Cir.1997)), and "reli[ance] upon an improper definition of disability in processing the beneficiary's claim," *Regula,* 266 F.3d at 1146 (citing *Tremain,* 196 F.3d at 977.)

■ *Regula* also included on the short list "deviation from the treating physician rule." *Id.* at 1147. Under the treating physician rule, a doctrine familiar from the Social Security context, the plan administrator was required to defer to the conclusions of the beneficiary's treating physician over those conclusions of the plan administrator's reviewing physician, unless the plan administrator was able to point to "specific, legitimate reasons that are based on substantial evidence in the record" for rejecting the treating physician's conclusions. *Id.* However, in a recent decision, the Supreme Court has invalidated the treating physician rule in the ERISA context. *Black & Decker Disability Plan v. Nord,* — U.S. —, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). It held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 1972. Accordingly, this Court will not apply the treating physician rule in deciding the present motions.

In this case, Plaintiff has provided evidence of both apparent and actual conflict of interest in line with the examples identified by the Ninth Circuit. Because Liberty is both the plan administrator and underwriter, it has a financial incentive to deny claims for benefits. Such an appar-

ent conflict of interest, by itself, is not sufficient to justify application of the less deferential standard. However, there is more. Liberty's dealings with Plaintiff, particularly during the period before Plaintiff retained counsel, were inconsistent. Plaintiff was preliminarily approved for benefits, and then denied, first because of the pre-existing condition exclusion, then because of a failure to provide "objective medical" evidence of disability, and finally because of the pre-existing condition exclusion. Plaintiff correctly points out that the policy includes no requirement that Plaintiff present objective medical evidence to support her claim. *See Canseco v. Construction Laborers Pension Trust for Southern California*, 93 F.3d 600, 608–9 (9th Cir.1996) (implied additional plan terms are disfavored); *Duncan v. Continental Cas. Co.*, 1997 WL 88374, *4 (N.D.Cal.1997) (holding that plan administrator "cannot exclude a claim for lack of 'objective medical evidence' unless the 'objective medical evidence' standard was made 'clear, plain and conspicuous enough [in the policy] to negate layman [sic] [plaintiff's] objectively reasonable expectations of coverage.' ").

In deciding Plaintiff's appeal, Liberty relied on a report prepared by Dr. Brown, concluding that Plaintiff was able to perform sedentary work, as an alternative basis for affirming its decision to deny Plaintiff's claim due to lack of disability. While the Court will not apply the treating physician rule, it concludes that Liberty's use of Dr. Brown's report is suspect. First, the Swirka letter denying Plaintiff's claim makes no mention of lack of disability. Second and more importantly, Dr. Brown's medical opinion ignores the principal bases of Plaintiff's claim for benefits and mis-characterizes facts from Plaintiff's medical history. The crux of Plaintiff's claim for disability benefits is severe and chronic pain and the cognitive impairments caused by the pain medications she must take to manage this pain. Plaintiff was employed as an engineer, which may be a sedentary occupation, but one that requires careful thought and concentration. Simply being able to perform sedentary work does not necessarily enable one to work as an engineer. Dr. Brown's conclusion that the pain medications Plaintiff takes should not prevent her from working, because her history of "chronic [narcotic] medication usage" at least to 1999 did not prevent her from working previously, is unsupported. This prior narcotic usage in 1999 was Tylenol with codeine. At the time of Dr. Brown's review, Plaintiff was taking high doses of medications such as Vicodin and Neurontin, medications that Liberty had previously agreed would cause disabling cognitive impairments.

The Court concludes that Plaintiff has met her prima facie burden of producing material, probative evidence tending to show a breach by Liberty of its fiduciary obligations to Plaintiff. Liberty provides no adequate rebuttal. Accordingly, the Court reviews Liberty's decision to deny benefits de novo.

◼ The Court having decided to conduct de novo review, Defendants' objection to evidence submitted by Plaintiff in opposition to Defendants' motions and in support of Plaintiff's motions is overruled. *See Tremain*, 196 F.3d at 976–7 (permitting a trial court to consider evidence outside of the claim file when it conducts de novo review); *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir.1995).

**B.** Liberty's Benefits Determinations

**1.** Burdens of Proof on De Novo Review

◼ In its de novo review of Liberty's decision to deny benefits, the Court must

decide: (1) whether Plaintiff is disabled under the terms of the plan and (2) if Plaintiff is disabled, whether she may nonetheless be denied benefits under an exclusion provision in the plan. The Court must first determine which party has the burden of proof on each issue.

In *Juliano v. Health Maintenance Organization of New Jersey, Inc.*, 221 F.3d 279, 287–8 (2nd Cir.2000), the Second Circuit held that it was the plaintiffs' burden "to establish that they were entitled to [the] benefit [sought] pursuant to the terms of the Contract or applicable federal law." In *Farley v. Benefit Trust Life Ins. Co.*, the Eighth Circuit noted that "an insurer's contention that a loss suffered is excepted by the policy's terms is generally regarded as an affirmative defense." 979 F.2d 653, 658 (8th Cir.1992) (quotations omitted).

The Court concludes that Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan and Defendants must carry the burden of proving the applicability of any plan coverage exclusion they seek to invoke.

### 2. Disability

■ With regard to the three elements on which Plaintiff must provide proof to establish the existence of her disability, the first two, date and cause of disability, are not disputed. Only extent of disability is in contention. Liberty argues that the medications taken by Plaintiff are not disabling because Plaintiff can perform sedentary work.

Inability to perform sedentary work is not the definition of disability set forth in the policy. The relevant definition of disabled in the policy is "unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness." Plaintiff submitted a disability questionnaire to Liberty dated January 1, 2001.

Responding to question 8—"Describe in your own words, what prevents you from performing your *own* occupation"—Plaintiff stated: "I am either in so much pain that I cannot function or if I take my pain medicine I must sleep often and cannot concentrate." CF–306. Dr. Gottlieb's progress notes from July 26, 2001, extended Plaintiff's disability to November 1, 2001, noting her "constant pain." CF–355.

Plaintiff has provided evidence of her inability to perform her occupation, which, together with undisputed facts regarding the date and cause of her disability, amounts to a prima facie showing of her eligibility for LTD benefits under the terms of the policy. Liberty initially found that Plaintiff was disabled. However, Dr. Brown's opinion upon which Liberty relies raises a disputed issue of material fact that precludes summary judgment. Accordingly, this issue will have to be decided on a bench trial on the administrative record pursuant to Rule 52, Fed. R. Civ. Pro. *Kearney v. Standard Ins. Co.*, 175 F.3d at 1094–95.

### 3. Exclusion

■ Liberty argues that Plaintiff was properly denied benefits under the policy's pre-existing condition exclusion. However, this exclusion applies only to a disability that begins within the first twelve months after the covered person's effective date of coverage. The policy's effective date was January 1, 2000 for enrolled McKesson employees actively at work on that date. If Plaintiff was actively at work on that date, the pre-existing condition exclusion would not apply because it is undisputed that the disability for which she has claimed LTD benefits—chronic hip pain—began in April, 2001, more than twelve months after January 1, 2000.

According to the policy, an employee who is on an excused leave of absence is

considered to be actively at work if he or she was actually at work on the day immediately preceding the excused leave of absence, unless the excused leave of absence is medical leave for the covered person's disabling condition.

The parties do not dispute that Plaintiff was on an excused leave of absence on January 1, 2000. The Court interprets the exclusion of "medical leave for the covered person's disabling condition" to refer to medical leave for the condition for which the covered person is claiming long term disability—here, Plaintiff's hip condition. Defendants argue that this phrase applies, claiming that Plaintiff's leave was for the hip condition for which Plaintiff later claimed LTD benefits. Defendants point out that Plaintiff's December, 1999, physician certification states that Plaintiff's leave was for "[c]ontinuing treatment for prenatal care and/or a chronic or long-term health condition."

Defendants' argument is unavailing. The McKesson physician certification form completed by Dr. Jacoby states that Plaintiff required leave for prenatal care or a chronic or long-term health condition or both. It is undisputed that Plaintiff was pregnant and gave birth during this leave. It is possible that Dr. Jacoby meant that Plaintiff required a leave for a chronic or long-term health condition and it is possible that the condition was Plaintiff's hip condition. However, the mere possibility that Plaintiff's leave was for her hip condition, as well as for her pregnancy and maternity, is not sufficient to satisfy Defendants' burden of showing that such was in fact the case. Furthermore, a handwritten note in Liberty's claim file mentions only "maternity" and not any other condition as the reason for Plaintiff's leave. *See* CF–17.

Plaintiff has established the second fact necessary to show that she was actively at work on January 1, 2000, the date Liberty's policy went into effect: that she was at work on the day before her December maternity leave began. Her declaration states that she worked for McKesson until her leave began on December 30. Defendants claim that this is insufficient. However, the only items of evidence they offer that she was not at work on December 29 are the claim file notes that indicate that her December leave began on December 1, rather than on December 30. This does not aid Defendants because if her leave began on December 1, the question would be whether she was at work on November 30. Her declaration that she worked up until December 30 is evidence that she was, and Defendants offer no evidence that she was not.

Accordingly, the Court concludes that Plaintiff has shown that the pre-existing condition exclusion does not apply and Defendants have failed to present evidence raising a disputed factual issue indicating that it does. Plaintiff is entitled to summary adjudication of this point. The Court need not address the parties' other arguments regarding prior coverage or a delayed effective date of coverage.

## CONCLUSION

For the foregoing reasons, Defendants' objection to evidence submitted by Plaintiff in opposition to Defendants' motions and in support of Plaintiff's motions (Docket No. 27) is OVERRULED. Defendants' motion for summary judgment (Docket No. 20) is DENIED. Plaintiff's motion (Docket No. 22) is GRANTED in part.

The Court will next consider, based on the administrative record and the additional evidence submitted on these motions, whether Plaintiff is disabled within the meaning of the policy, and thus entitled to disability benefits up to the date of judgment. If the Court determines that she is, the Court will also have to determine the

amount of benefits owed. The Court directs Plaintiff to submit evidence of the amount of LTD benefits due to her as of November 1, 2003, and a proposed form of judgment. Plaintiff shall submit this no later than ten days from the date of this order. Defendants may file a response five days thereafter. The Court will then, pursuant to Rule 52, Federal Rules of Civil Procedure, issue judgment.

IT IS SO ORDERED.