**Fred KUSHNER, Plaintiff,**

v.

**LEHIGH CEMENT COMPANY, a corporation; Life Insurance Company of North America, a corporation, Defendants.**

**Case No. CV 06–5325 CAS (SSx).**

United States District Court,
C.D. California,
Western Division.

Aug. 15, 2008.

Charles J. Fleishman, Charles J. Fleishman Law Offices, Northridge, CA, for Plaintiff.

Debra L. Fischer, Yehonatan Cohen, Bingham McCutchen, Heather C. Beatty, Metropolitan Water District of Southern California Office of the General Counsel, Daniel W. Maguire, Melissa M. Cowan, Burke, Williams & Sorensen, Los Angeles, CA, for Defendants.

## AMENDED ORDER DENYING LONG–TERM DISABILITY BENEFITS

CHRISTINA A. SNYDER, District Judge.

This case was tried to the Court on July 25, 2008. Charles J. Fleishman appeared for plaintiff and Melissa M. Cowan of Burke, Williams & Sorensen, LLP appeared for defendant Life Insurance Company of North America ("LINA"). Having carefully considered the administrative record and the arguments of the parties, the Court finds and concludes as follows:

## I. PROCEDURAL HISTORY

Plaintiff Fred Kushner was employed by defendant Lehigh Cement Company ("Lehigh") as a Senior System Business Analyst. In connection with his employment, plaintiff was insured by a long term disability ("LTD") policy, policy number FLK 0030077, issued by LINA.

Plaintiff underwent heart surgery in January 2004. Following surgery on June 7, 2004, plaintiffs cardiologist, Lee Dykstra, M.D., found that plaintiff remained totally disabled from his occupation until August 7, 2004, because he could not do the traveling that was supposedly required by his job. AR 305.

Six weeks later, on July 23, 2004, after the elimination period under the LTD policy had already expired, plaintiff reported to Dr. Dykstra that he was doing margin-

ally better, but that he was now very anxious about returning to work. Dr. Dykstra reported that plaintiff was suffering from anxiety, and referred him to a psychiatrist. Dr. Dykstra extended plaintiff's disability to August 8, 2004. AR 197, 313.

Thereafter, in late August 2004, plaintiff submitted a disability claim to LINA under the LTD plan. AR 363. Plaintiff claimed that he was suffering from an inability to work in his occupation as of January 28, 2004, due to cardiac surgery, angina, anxiety over his recovery and lack of strength. *Id.* Plaintiff identified Dr. Dykstra as his only treating physician. *Id.* On September 21, 2004, Dr. Dykstra noted that plaintiff was having a "slow recovery from" the cardiac surgery. AR 314. An Attending Physician Statement ("APS"), dated August 16, 2004, from an "authorized representative" of Dr. Dykstra, stated that Dr. Dykstra initially saw plaintiff on January 28, 2004, and saw him "as needed" for subjective complaints of atherosclerosis, hypertension, angina and anxiety/stress. He estimated Kushner could return to work on September 18, 2004. AR 375–376. Dr. Dykstra also noted in the "Mental Impairment" section of the form that mental impairment was "N/A" [not applicable]. AR 375–376.

Lehigh provided LINA with plaintiff's Social Security disability application from August 2004, his state disability payments, and his Application for Family Medical Leave ("FMLA"), dated March 25, 2004. AR 361, 364–368, 371–373. In contrast to the APS, Dr. Dykstra reported on the FMLA form that plaintiff had undergone triple bypass surgery on February 10, 2004, and could return to work "without restrictions" on June 8, 2004. There was no indication of any "anxiety/stress." AR 371–373.

Lehigh also supplied a job description, indicating that plaintiff was responsible for applying technology within specific business areas, supervising IT staff, determining business needs, budgeting, working with software vendors, etc. No travel requirement was indicated. AR 369. Lehigh's benefits specialist described plaintiffs position as sedentary, requiring 60% sitting, 20% standing, 10% walking, and 5% bending. AR 362. LINA confirmed this was a sedentary occupation. AR 326–327.

LINA also procured plaintiff's medical records from Kaiser in Bellflower, California, where plaintiff had been treated by Dr. Dykstra. While these records disclosed that plaintiff had an extensive history of cardiac disease, they also demonstrated that at least through July 23, 2004, when plaintiff first reported an anxiety disorder, plaintiff had not reported, or been treated for, any such disorder. Further, the medical records did not reveal any decline or complications with plaintiff's cardiac condition.

LINA submitted plaintiff's medical records to a nurse case manager who concluded that there were no clinical findings that supported an impairment through the benefit start date of July 20, 2004, in light of the fact that plaintiff's treatment had been appropriate and free of any post-operative complications. AR 043.

On October 20, 2004, LINA denied plaintiff's claim for long term disability benefits through the benefit start date of July 20, 2004, stating that plaintiff did not meet the definition of total disability from his sedentary occupation. AR 269. The October 20, 2004 letter noted that according to his doctor, plaintiff had no restrictions placed on him by his physician, and there were no post-operative complications other than incision pain. *Id.* In this regard LINA noted that according the Dictionary of Occupational Titles (DOT), plaintiff's regular occupation did not re-

quire extensive travel as stated by Dr. Dykstra on June 7, 2004. *Id.* As such, the letter concluded that "[t]he medical information on file does not support your inability to perform the duties of your sedentary occupation." *Id.*

On May 4, 2005, plaintiff, now represented by counsel, appealed the denial of benefits. Counsel asserted that "as it turns out, [plaintiff] is disabled from a psychiatric perspective." AR 226–227. Accompanying the May 4, 2005 letter were records of plaintiff's mental health treatment at Kaiser through February 24, 2005. Included therewith was the August 11, 2004 initial evaluation of plaintiff by his psychiatrist, Maria Lourdes U. Agbing, M.D., and his psychologist Roger Lewis, as well as a March 10, 2005 memorandum from Dr. Agbing to plaintiff's counsel in this action.

On June 29, 2005, Dr. Agbing sent LINA a Mental Capacities Evaluation form. The Mental Capacities Evaluation found that plaintiff suffered, for the most part, "moderately-severe" symptoms, except for "severe" inability to perform tasks on a full-time basis.[1] AR 191. Dr. Agbing further stated that plaintiff was totally disabled psychiatrically with a diagnosis of Major Depressive Disorder. *Id.* She further wrote that his symptoms of "depression—irritability, lack of optimism, sadness, anxiety, thoughts of death, fear to be outside of home, decreased energy, and increased worry about the future" dated from the time of his cardiac surgery in early 2004. AR 190. LINA was also notified that plaintiff had been found to be totally disabled by the Social Security Administration ("SSA"). AR 189.

On July 20, 2005, a psychiatrist employee of LINA, Mohsin Qayyum, M.D. reviewed the materials from Dr. Agbing and wrote, "[t]he reports of procrastination, low energy and low stamina do not constitute a psychiatric impairment. The other psychiatric symptoms reported are not severe enough to preclude the CX [claimant] from work capacity." AR 31. Dr. Qayyum wrote that Dr. Agbing had not conducted psychological or cognitive tests to confirm cognitive problems, and noted that plaintiff had taken a vacation, talked with his therapist about joining Weight Watchers, discussed pursuing job opportunities, and volunteering at his son's school. *Id.* Dr. Qayyum concluded that plaintiff was not working "due to such issues of choice or preference for certain types of employment" and concluded that such a reason for not working does not equate with being unable to work because of psychiatric disability. *Id.*

On July 21, 2005, LINA denied plaintiff's administrative appeal based on the opinion of Dr. Qayyum.

Plaintiff appealed again on July 29, 2005. AR 171. On August 22, 2005, in response to Dr. Qayyum's criticism that there was no mental testing for concentration and memory problems, Dr. Agbing wrote, "[t]here were no psychological tests performed despite his complaints of decreased concentration and memory because these are usual symptoms of patients that we see with depression and anxiety. We do not evaluate patients for Worker's Comp or other liability issues; we request the psychological testing based on clinical indication." AR 169.

An October 13, 2005 report from Kaiser reported that plaintiff had been tested for depression with the Beck Depression Inventory test and found to be severely depressed. AR 138. Dr. Agbing reviewed the results of the testing and noted that her patient has some weakness of memory, processing/concentration as well as severe

---

1. "Moderately-severe" is defined as "[a]n impairment, which seriously and significantly interferes with the ability to perform basic work activities independently, appropriately, and effectively." AR 191.

depression. As of January 18, 2006, plaintiff according to his treating psychiatrist, "remains disabled and unable to perform his previous job." AR 166.

A medical records review of the heart condition was done by Paul Sweeney, M.D. on behalf of LINA on April 8, 2006. AR 118. Dr. Sweeney, who is a cardiologist, opined considering the cardiac condition only that plaintiff could have returned to work on June 8, 2004. *Id.*

A records review was conducted by John P. Shallcross, Psy. D., on April 24, 2006, on behalf of LINA. AR 109. On May 2, 2006, LINA denied the second appeal based upon the record review reports of Drs. Shallcross and Sweeney. LINA's denial letter pointed out that Dr. Shallcross's questions to Dr. Agbing had not been answered, and that in any event, Dr. Shallcross had concluded that the record failed to support the conclusion that plaintiff is mentally disabled. AR 105.

On May 9, 2006, counsel for plaintiff wrote to LINA pointing out that he had never been told about the questions to Dr. Agbing and never been given copies of the Sweeney/Shallcross reports in spite of a request for reports that LINA may obtain prior to a denial of the administrative appeal. AR 226.

On July 3, 2006, Dr. Agbing, who had apparently been unaware of these questions, answered Dr. Shallcross's questions. AR 84. In response to the question about why there was no neurological support for disability, she noted that plaintiff's condition was psychiatric. *Id.* She described plaintiffs self-reported symptoms and the objective signs that she herself had observed. *Id.* She found no issue of symptom exaggeration, as suggested by Dr. Shallcross. *Id.* In response to Dr. Shallcross's criticism of the Beck Depression Inventory test, which showed Mr. Kushner to be severely depressed, Dr. Agbing noted that the Beck Depression Inventory test is "a wildly (sic) used" rating scale for depression. AR 85.

Dr. Shallcross thereafter prepared an addendum to his report on July 24, 2006, again concluding that the record did not support a finding of total disability. AR 72.

On August 8, 2006, LINA wrote, "Dr. Shallcross ... has concluded that the information from Dr. Agbing does not support a mental and nervous impairment that would preclude work capacity prior to of beyond June 8, 2004. Therefore Mr. Kushner's claim will remain closed." AR 76.

Plaintiff now seeks to recover long term disability benefits for his claimed psychiatric disability, as well as for a current cancer diagnosis.[2]

## II. STANDARD OF REVIEW

Under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the terms of an ERISA plan are generally interpreted *de novo*. However, where, as here, a benefit plan gives an administrator discretionary authority to determine eligibility for benefits or interpret the plan terms, the administrator's eligibility determination is reviewed according to an abuse of discretion—or "arbitrary and capricious"—standard. *Peralta v. Hispanic Bus., Inc.*, 419

---

**2.** The assertion of a new ground for disability arose at the July 25, 2008 hearing herein. LINA objected thereto on the ground that such claim is first made years after the expiration of the elimination period of the LTD policy at issue in this case. Counsel for plaintiff responded that if plaintiff were found to be totally disabled, this claim would have to be remanded for consideration by the plan administrator. In light of the Court's ruling herein, it is unnecessary to resolve whether plaintiff is totally disabled based on his current medical condition.

F.3d 1064, 1074 n. 14 (9th Cir.2005); *Sabatino v. Liberty Life Assur. Co.,* 286 F.Supp.2d 1222, 1229 (N.D.Cal.2003).

On the other hand, an insurer's status as both the underwriter of the Policy and the claims administrator gives rise to a structural conflict of interest, which affects the applicable standard of review. *Mitchell v. Metro. Life Ins. Co.,* 523 F.Supp.2d 1132, 1143 (C.D.Cal.2007) (entity that was both the claims administrator and the insurer had an inherent conflict of interest): *cf. Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 965 (9th Cir.2006) (en banc) ("an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest.").

■ Where a person's claim to ERISA plan benefits has been denied by an administrator which (1) has been conferred discretion under the terms of the plan and which (2) has a conflict of .interest, the applicable standard of review is that set forth in *Abatie.* *See Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 867–68 (9th Cir.2008) (treating claims administrators in the same manner as plan administrators for the purposes of *Abatie* ). In *Abatie,* the court held that, in these circumstances, a court must review the administrator's determination for abuse of discretion, but that this review is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Id.* at 968. This standard, the court stated, "applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as to other forms of conflict." *Id.*

■ The court advocated a case-by-case approach to weighing an administrator's conflict of interest as part of its abuse of discretion analysis. *Id.* "A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might." *Id.* The court elaborated,

[t]he level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

. . .

courts are familiar with the process of weighing a conflict of interest. For example, in a bench trial the court must decide how much weight to give to a witness' testimony in the face of some evidence of bias. What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records.[3]

*Id.* at 968–69 (citations omitted).

■ *Saffon,* construing *Abatie,* stated, "when reviewing a discretionary denial of

---

3.  *Abatie* also set forth rules regarding what

materials a court may consider in conducting

benefits by a plan administrator who is subject to a conflict of interest, we must determine the extent to which the conflict influenced the administrator's decision and discount to that extent the deference we accord the administrator's decision." *Saffon,* 522 F.3d at 868 (9th Cir.2008).

The Supreme Court's recent decision in *Metro. Life Ins. Co. v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), is consistent with the standard of review set forth in *Abatie. See Troutman v. Unum Life Ins. Co. of Am.,* 2008 WL 2757082, at *5, 2008 U.S. Dist. LEXIS 53756, at *16 (N.D.Cal.2008) ("This Court sees no inconsistency between the Ninth Circuit's holding in *Abatie,* on which this Court earlier relied, and the Supreme Court's recent decision in *Metropolitan Life* ..."). In *Metropolitan Life,* the Supreme Court considered how an insurer's structural conflict of interest should be taken into account on judicial review of a discretionary benefit determination. First, the Court clarified that where there is a conflict of interest, the reviewing court must apply a deferential standard of review, although one that takes account of the conflict when determining whether the plan administrator has abused its discretion. *Id.* at 2350. However, the Court eschewed a "one-size-fits-all procedural system" for weighing the significance of an administrator's conflict of interest, emphasizing that benefits decisions and conflicts vary greatly from case to case. *Id.* at 2351. Rather, the Court stated, the ad-

ministrator's conflict must be weighed as one factor among many. *Id.* The Court went on to state that

> any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. *See* Langbein, *Trust Law as Regulatory Law,* 101 Nw. U.L.Rev. 1315, 1317–21 (2007) (detailing such a history for one large insurer [i.e. Unum] ). It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits.

*Id.* at 2351.

### III. THE PLAN

Effective January 1, 2000, LINA issued to Lehigh its group policy number FLK 0030077, providing LTD insurance benefit

---

the foregoing analysis. The court noted the prevailing rule in the Ninth Circuit and elsewhere that, under an abuse of discretion standard of review, a court is limited to considering the materials before the plan administrator. *Id.* at 970; *see Jebian v. Hewlett–Packard Co. Emple. Benefits Org. Income Prot. Plan,* 349 F.3d 1098, 1110 (9th Cir.2003). It adopted a different rule for those circumstances in which a court must determine what weight to accord a plan administrator's conflict of interest. In such cases,

[t]he district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise.

*Id.* at 970.

for eligible employees as part of an employee benefit plan governed by ERISA. [*See* AR 377–429; LCC0001–30]. For Class 1 employees like plaintiff, the Plan provides LTD benefits, after a 180–day waiting period, at a rate of 60% of monthly covered earnings, less other income benefits such as state, workers' compensation, Social Security disability and employer's retirement benefits, until age 65.[4] [AR 9, 50, 383, 399–400, 411–413, LCC0009–10, LC00014–5]. For the first 24 months after the elimination period, an employee is considered disabled if, solely because of Injury or Sickness, he or she is either (1) unable to perform all the material duties of his or her regular occupation, as performed in the general labor market in the national economy, or (2) unable to earn 80% or more of his or her Indexed Covered Earnings. [AR 399, LC0022]. After 24 months of benefits, the disability standard changes to an inability to perform all the substantial and material duties of "any occupation" for which he or she is, or may reasonably become, qualified based on education, training or experience, or is unable to earn 80% of indexed covered earnings. [AR 399, LC0022]. The employee must demonstrate he is continuously disabled during the 180–day elimination period to be eligible for benefits. [AR 399, 415, LCC0012].

The LTD Plan requires the employee to demonstrate total disability throughout the elimination period, be under the appropriate are of a physician, meet all the Plan's terms and conditions, and provide "satisfactory" proof of disability before benefits will be paid. [AR 415, LC0012]. In this regard the LTD Plan provides "[t]he Elimination Period is the period of time you must be continuously Disabled before Dis-

ability Benefits are payable ... A period of Disability is not continuous if separate periods of Disability result from unrelated causes." The LTD Plan further provides that limited benefits are available for disabilities "caused by, or contributed to by" mental illness, including anxiety, delusional, and depressive disorders, up to a maximum of 24 months. [AR 419, LCC0015–16].

The Plan gives LINA discretionary authority to make claims decisions under the terms of the LTD Plan. Specifically, LINA has the authority, "in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of the Plan to the full extent permitted by law." [AR 382, LCC0019].

## IV. SUMMARY OF THE PARTIES ARGUMENTS

Because many of the facts are disputed, the Court will first summarize the positions of the parties.

Plaintiff initially argues that his claim of psychiatric disability arose before the expiration of the Elimination Period because Dr. Dykstra extended his period of disability on June 7, 2004, based upon the fact that plaintiff could not travel as required by his work. Plaintiff, relying on late-produced Exhibit 431, argues that in determining that he was not totally disabled, LINA ignored the fact that the job description for his employment indicated that the position required that the employee travel extensively.[5] Plaintiff next chal-

---

4. Kushner selected the 70% benefit buy-up option. [AR 9, 50. 330–332, 399–400].

5. LINA argues that Exhibit 431 should be stricken because it is irrelevant and its au-

thenticity is suspect. The Court finds that Exhibit 431 is not relevant in light of the definition of "regular occupation" contained in the LTD policy.

lenges the impartiality of Drs. Qayyum and Shallcross, arguing that because they regularly review cases for LINA, and in the case of Dr. Shallcross, other insurance companies, their testimony should be discredited. Plaintiff further argues that greater weight should be accorded to the opinions of plaintiff's treating physicians than to LINA's experts because they are treating physicians who actually treated plaintiff. Plaintiff concludes that based on the totality of LINA's conduct, including the fact that LINA's doctors did not examine plaintiff, conducted a cursory review of the record, and ignored the fact that the SSA determined that he is totally disabled require the Court to utilize a heightened standard of scrutiny.

In opposition, LINA argues that plaintiff's claims of disability appear to be questionable for a variety of reasons which, in turn, justified its denial of benefits. LINA first argues that the psychiatric disability claim arose after the expiration of the Elimination Period on July 20, 2004. In support of this conclusion, LINA relies on Dr. Sweeney's opinion that plaintiff could return to work on June 8, 2004, noting that Dr. Dykstra's extension of plaintiff's disability period based on plaintiff's inability to travel did not enlarge the Elimination Period because travel was not a requirement of plaintiff's employment.

Even if plaintiff's claim of psychiatric disability arose before the expiration of the Elimination Period, LINA nevertheless argues that the record does not support the conclusion that plaintiff was totally disabled from performing his regular occupation. In particular, LINA notes that at the time of his initial mental health evaluation on August 11, 2004, plaintiff reported that he had been laid off, and that he was

concerned that he would lose his job when his disability ended.[6] LINA therefore argues that plaintiff's claims of total disability from being able to perform his occupation are suspect. In addition, LINA notes that plaintiff's treating physicians, Drs. Dykstra and Agbing, did not provide findings that were corroborative of their conclusions, and that they failed to respond to inquiries made by LINA with regard to their reports.[7] LINA further denies that it was apprised of the basis upon which plaintiff was found to be totally disabled by the SSA. LINA further argues that the SSA award is in any event irrelevant because a different standard applies in Social Security cases than in ERISA cases. As to the question of whether travel was a requirement of plaintiff's employment, LINA argues that travel was never identified as one of plaintiff s occupational duties by his employer, and that under the terms of the LTD policy, "regular occupation" is defined as the "duties of the occupation as it is normally performed in the general labor market of the national economy." AR 424.

### V. DISCUSSION

■ As set forth above, for plaintiff to recover under the LTD policy, he must establish that he suffers from sickness or injury, but also that his sickness or injury prevents him from performing the material duties of his occupation. Because both of these elements must be established, LTD benefits may rightfully be denied where plaintiff has failed to show that he is totally disabled from his occupation. In this case, even assuming that a heightened standard of scrutiny applies, LINA did not abuse its discretion in denying benefits.

6. LINA has provided no documentary evidence that plaintiff was laid off.

7. In response, plaintiff provides evidence that neither doctor received Lina's inquiries, and that Dr. Agbing did respond when apprised of LINA's questions.

■ The record demonstrates that plaintiff went out for heart surgery in January 2004. Following surgery, Dr. Dykstra asserted that plaintiff would be disabled through August 7, 2004, because he could not do the traveling required by his job. However, whether or not plaintiff could travel was irrelevant in light of the definition of "regular occupation" set forth in the LTD policy. After the elimination period on the LTD policy had expired, on July 23, 2004, plaintiff first reported anxiety and depression. Although these conditions may be associated with heart surgery, LINA points to evidence in Dr. Dykstra's August 16, 2004 report stating that with regard to any condition of "Mental Impairment," the answer was "N/A." AR 375–376. Further, Dr. Agbing's notes reflect that plaintiff believed that once his disability benefits ceased, he would be unemployed. AR 209, 249–250. LINA also points to credible evidence that Dr. Agbing failed to conduct certain tests for depression, and that the test she relied upon, the Beck Depression Inventory test, did not support a finding of total disability. In this regard, on July 20, 2005, LINA's expert, Dr. Qayyum concluded that the medical records submitted by Dr. Agbing did not support psychiatric functional impairment. Dr. Qayyum noted that plaintiff had received Global Assessment of Functioning ("GAF") scores of 60 and 68, placing him in the moderate to high level of psychological functioning; there was a lack of psychological or cognitive testing to support impairment; and the mental status examination findings provided no objective documentation or observations to support cognitive deficits. AR 172–174. Dr. Qayyum also noted that plaintiff's complaints of procrastination, low energy and low stamina did not constitute psychiatric impairment, and concluded that these com-plaints arose from plaintiff's apparent preference not to seek new employment. *Id.*

With regard to LINA's decision to deny plaintiff's appeal of his psychiatric claim, LINA requested that Dr. Shallcross analyze Dr. Agbing's opinions. Dr. Shallcross opined that plaintiff's claim was not supported by the evidence. First, Dr. Shallcross disagreed with Dr. Agbing's conclusion that plaintiff suffered from memory problems and lack of concentration due to depression. According to Dr. Shallcross, the only indicator of depression was from the Beck Depression Inventory test which was based on plaintiff's self-reporting, which Dr. Shallcross believed to be unreliable because the test did not have internal validity scales or measures. The tests also showed that plaintiff had good problem-solving skills, that he fell within the average range of memory tests, and any claimed memory or concentration deficits were clinically insignificant. Finally, Dr. Shallcross noted that Dr. Agbing had not reported any symptoms that would prevent plaintiff from working. AR 73–74.

## A. LINA Did Not Improperly Require Objective Evidence in Denying Plaintiff's LTD Benefits.

■ Plaintiff claims that his subjective complaints should be accepted at face value. The rule is to the contrary. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 875 (9th Cir.2004). There, consulting physicians and treating physicians disagreed as to whether plaintiff was totally disabled because she suffered from fibromyalgia. The court found it appropriate for the plan administrator to consider the opinions of experts because to require the plan administrator to rely on physicians chosen by the applicant would undermine the terms of the LTD policy which reposes discretion in the plan administrator.[8]

---

**8.** Plaintiff argues that *Northrop Grumman* was overruled by *Abatie.* However, plaintiff is incorrect. *Abatie* merely holds that in contrast to the rule set forth in *Northrop Grum-*

While it is true that LINA's experts did not treat plaintiff, and merely reviewed Drs. Dykstra's and Agbing's notes, they are not required to do so for the reasons set forth in *Northrop Grumman*. Drs. Dykstra and Agbing recorded in large measure what plaintiff had reported to them. LINA's experts are not bound to accept what plaintiff reports. They are entitled to conduct an independent investigation to determine whether there is evidence to support a claim of disability. Accordingly, the Court finds that LINA did not improperly require objective evidence in reaching its decision regarding plaintiffs claim.

### B. Plaintiff's Contention That the Treating Physician Rule Should Govern this Case Is Incorrect.

■ Plaintiff next argues that LINA should have deferred to Dr. Agbing's depression diagnosis and opinion of disability because LINA did not conduct an in-person medical examination or testing. This contention is contrary to the law. Nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the ERISA impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

■ ERISA also does not require that an insurer seek independent medical examinations. *Rutledge v. Liberty Life Assur. Co. of Boston*, 481 F.3d 655, 661 (8th Cir.2007); *Fought v. UNUM*, 379 F.3d 997 (10th Cir.2004); *Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 335 (5th Cir.2001); *Stith v. Prudential*, 356 F.Supp.2d 431 (D.N.J.2005); *Conti v. Equitable*, 227 F.Supp.2d 282, 292 (D.N.J. 2002); *Mason v. M.F. Smith & Assoc., Inc.*, 158 F.Supp.2d 673, 685 (D.S.C.2001). The cases cited by plaintiff to attack file reviews are distinguishable and do not stand for the proposition advanced.[9]

Plaintiff's position is further undermined by the wide acceptance in ERISA and disability cases of record reviews by psychiatrists and other doctors, without in person examinations, to uphold the propriety of claims decisions based on such re-

*man*, which required plaintiff to make a threshold showing of a serious conflict of interest as a condition to the court engaging in a heightened standard review, after *Abatie*, the court must always consider whether a conflict exists as part of its review for abuse of discretion.

**9.** Plaintiff misapplies *Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228 (S.D.N.Y. 2005) in which the district court found the administrator assessed only a claimant's cardiac condition, not his co-morbid psychiatric complaints. The court considered additional evidence regarding the reliability of the treating physician's testimony only for use with a *de novo* review. However, the court acknowledged that face-to-face contact between an insurer's psychiatric expert and the claimant is not always necessary. *Id.* at 255, n. 18. Unlike *Sheehan*, an abuse of discretion standard applies, and LINA also appropriately evaluated both of plaintiff's purported conditions.

The other cases cited by plaintiff are equally unpersuasive. In *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir.2005), the court found nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination, but determined that the medical review was severely inadequate, failed to describe data, and ignored objective findings. The court therefore concluded an IME should have been considered. *Id.* at 296. The other cases plaintiff cites, all of which rely on *Calvert*, are equally unavailing. For example, in *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 621 (6 Cir.2006), the court acknowledged that "plans generally are not obligated to order additional medical tests," but suggested it could be helpful. That is not the law, as discussed above, particularly when plaintiff has the burden of proof.

views. *Semien v. Life Ins. Co. of N. Am.,* 436 F.3d 805, 812 (7th Cir.2006) (denial upheld where independent psychiatric consultant reviewed claimant's medical history without personal examination); *Vercher v. Alexander & Alexander Inc.,* 379 F.3d 222, 230 (5th Cir.2004) (record review by psychiatric consultant supported administrator's appropriate determination that plaintiff should not receive disability benefits); *Lawless v. Northwestern Mut. Life Ins. Co.,* 360 F.Supp.2d 1046, 1056 (N.D.Cal. 2005) (no abuse of discretion where insurer obtained two psychiatric consulting record reviews); *Voight v. Metropolitan Life Ins. Co.,* 28 F.Supp.2d 569, 580 (C.D.Cal.1998) (upholding insurer's denial in part based on psychiatric record reviews); *Parker v. Kemper Ins. Co.,* 2006 WL 1889915, **9–10, 2006 U.S. Dist. LEXIS 48885, **25–28 (N.D.Cal.2006) (no independent medical examination required where two physicians and a psychologist analyzed the medical record); *Fox v. Kaiser Found. Employee Benefit Plan,* 2006 WL 1709040, **16–17, 2006 U.S. Dist. LEXIS 40975, **48–49 (N.D.Cal.2006) (denial of benefits relying on psychiatric consultant record review was reasonable); *Toth v. Auto. Club of Cal. Long Term Disability Plan,* 2005 WL 1877150, *32, 2005 U.S. Dist. LEXIS 40746, *125 (C.D.Cal.2005) (no obligation to conduct psychiatric IME).

## C. LINA's Consulting Physicians Are Not Biased.

Plaintiff's attacks on LINA's consultants, Drs. Qayyum and Shallcross, are also unavailing. Each asked legitimate questions regarding the tests employed by Dr. Agbing, and their conclusions appear to be reasonable in light of the record. These consultants appear to have reviewed the record, the facts reported by plaintiff, and concluded that plaintiff had not established that he is totally disabled.

## D. The Social Security Award Is Irrelevant.

■ Nor is LINA's denial of LTD benefits undermined by the decision of the SSA finding plaintiff to be disabled. The Ninth Circuit has long held that such an award is not binding on a plan administrator in an ERISA case. *Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279, 1285 (9th Cir.1990). The test for Social Security disability is different than that required under ERISA because the SSA is obligated to apply "the treating physician rule" which requires that greater weight be given to the opinions of a treating physician unless rejected by specific substantial evidence in the record. *Butler v. Shoemake,* 173 F.Supp.2d 1069, 1076 (D.Or.2001).

## VI. CONCLUSION

As set forth above, the Court must analyze each case based on its own facts. Here, despite plaintiff's assertion that LINA acted with a conflict of interest, there is little evidence to support this assertion. Plaintiff's own doctors submitted reports that reasonably raised questions about their diagnoses. While LINA has not submitted any actual notice showing that plaintiff was laid off prior to his surgery in January 2004, there is little reason to discredit Dr. Agbing's numerous notes and reports to the effect that plaintiff's depression related to the fact that his employment would end at the conclusion of his disability period. Plaintiff has failed to note any fact in the record that is the "tie-breaker" referenced in *Metro Life Ins. Co. v. Glenn, supra.* Accordingly, while there can be little doubt that plaintiff has suffered from a significant depression disorder, it cannot be said that LINA abused its discretion in finding that plaintiff failed to demonstrate that he met the definition

of total disability and denying benefits to plaintiff.

IT IS SO ORDERED.