DATED: January 18, 2008

**Karen HOLIFIELD, Plaintiff,**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA; KJC Operating Company Short Term Disability Plan; KJC Operating Company Long Term Disability Plan, Defendants.**

**No. EDCV 07–0239 SGL (JCR)x.**

United States District Court, C.D. California.

Aug. 5, 2009.

Brent Dorian Brehm, Corinne Chandler, Glenn R. Kantor, Kantor and Kantor LLP, Northridge, CA, for Plaintiff.

Linda M. Lawson, Russell G. Gomm, Simon Manoucherian, Meserve Mumper & Hughes LLP, Los Angeles, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEPHEN G. LARSON, District Judge.

This matter is before the Court on administrative review. Plaintiff Karien Holifield [1] worked as a controller at KJC Operating Company ("KJC") through July 25, 2002, when she stopped working based upon her doctor's advice and a variety of symptoms associated with epidemic neuromyasthenia, also known as chronic fatigue syndrome ("CFS"). This action arises out of plaintiff's appeal of defendant Unum's denial of her subsequent claim for short-term disability ("STD") benefits. The Court has reviewed the parties' briefs and the administrative record. Having now carefully considered the full record and arguments of the parties, the Court finds and concludes as follows:

### I. The Policy

Holifield's employer, KJC Operating Company, held both short-term and long-term disability insurance policies for its employees issued by Unum, policy number 513491 001. Administrative Record ("AR") 227. Under the STD policy, an employee is eligible to receive disability benefits after sixty days of continuous disability. AR 132, 229. The long-term disability ("LTD") policy provides for benefits once the employee is continuously disabled for 180 days. AR 231.

Under the STD policy, an individual is deemed disabled upon a determination that he or she is "limited from performing the material and substantial duties [2] of [his or her] regular occupation due to [his or her] sickness or injury" and as a result, has a 20% or more loss in weekly earnings. AR 244. Unum uses the same definition for the first 24 months of long-term disability, except that the earnings loss is measured in terms of indexed monthly, not weekly, earnings. AR 252. The policy also requires an individual to be under "the regular care of a physician." AR 233, 235. A claimant is receiving "regular care" when he or she "personally visit[s] a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat [his or her] disabling condition(s); and [is] receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for [his or her] disabling condition(s) by a physician whose specialty or experience is the most appropriate for [his or her] disabling condition(s), according to generally accepted medical standards." AR 277.

### II. Administrative Record

The internal claims file of the insurer, filed with the Court under seal as the Administrative Record, reveals the following:

#### The Initial Claim

On July 25, 2002, Holifield stopped working in her position as a controller as a result of "headaches, severe exhaustion,

---

1. Although Ms. Holifield's name appears to be properly spelled "Karien," the complaint was captioned and filed on behalf of "Karen Holifield."

2. The term "material and substantial duties" is further defined as those duties that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." AR 275.

cognitive dysfunction, and decreased coping skills in regard to stress." AR 14–16.

On October 28, 2002, KJC filed a disability claim with Unum on Holifield's behalf under both the short-term and long-term disability policies. AR 15–18 ("the claim"). Included in the claim was a statement from Holifield's attending physician, Dr. Ronald Kundargi. The statement explained that Holifield suffered from epidemic neuromyasthenia,[3] resulting in symptoms of severe headaches, muscle and joint pains, devastating fatigue, and cognitive dysfunction. AR 18. Dr. Kundargi indicated that he was treating Holifield with a variety of over-the-counter and prescription medications, and seeing her for bimonthly office visits. *Id.* Dr. Kundargi noted Holifield's condition had improved since her first visit and that she was ambulatory, but that she could not work in her current condition. *Id.* On a scale provided by Unum, he indicated Holifield was severely limited in terms of her physical functional capacity, and thus incapable of sedentary activity, and was only able to engage in limited interpersonal relations and low stress situations. AR 18. He indicated that Holifield would likely be able to return to work within three to six months, suggesting she could return to work on January 6, 2003. *Id.*

On November 4, 2002, Unum sent a letter to Holifield informing her that they would be requesting medical records from Dr. Kundargi. AR 180. On November 5, 2002, Unum sent a fax to Dr. Kundargi, requesting copies of all medical records relating to Holifield's treatment from January 1, 2002 onward. AR 33–35. Receiving no response, Unum closed Holifield's claim via letter on December 27, 2002, informing her it would reopen the claim if the requested records were received within 30 days. AR 189. Dr. Kundargi contacted Unum on January 27, 2003, and indicated he was having some difficulty gathering some records and would fax the forms within a few days. AR 195. Both Holifield and Unum placed multiple follow-up telephone calls with Dr. Kundargi from late January through February 2003. AR 36–39, 198–213. On February 18, 2003, Unum again sent Holifield a letter informing her that her case would be closed if Dr. Kundargi did not submit the requested records by March 2, 2003. AR 214. After more follow-up by Holifield and Unum, Dr. Kundargi finally transmitted the medical records to Unum on March 17, 2003, a full four months after they were first requested. AR 215–19, 40.

### The Records Initially Submitted by Dr. Kundargi

The records obtained several relevant pieces of information. First, they included various documents from January 17, 2002, when Holifield first visited Dr. Kundargi's office complaining of headaches, muscle and joint pain, cognitive defects, and devastating fatigue with normal activity. AR 48. On that date, Holifield completed self-inventories noting a variety of neurological symptoms, including abnormal visual patterns, difficulties in understanding verbal communications, hearing nonexistent sounds, vertigo, sudden sweats, blocking, memory difficulties, abrupt onsets of emotion, headaches and a variety of extrasensory perception ("ESP") experiences. AR 43–44, 49. She indicated she was experiencing low to moderate pain in her right thigh and both hands, but that the pain was not interfering at all with her activity, mood, work, personal relations, or enjoyment of life, and slightly interfering with her sleep and walking ability. AR 45–47. Holifield reported having experienced these symptoms since 2001, and that they had been progressively worsening. AR 48.

---

3. This condition is also known as chronic fatigue syndrome ("CFS"). AR 48.

In his initial examination of Holifield, Dr. Kundargi noted Holifield had tender carotid arteries as well as tenderness of various muscles throughout her body, and diagnosed Holifield with epidemic neuromyasthemia (CFS). AR 48. As a course of treatment, he recommended a variety of vitamins and nutritional supplements, including antioxidants, co-enzyme Q–10, and grape seed extract. *Id.* He also prescribed the antibiotic Biaxin and antiviral Valtrex. *Id.* Dr. Kundargi advised Holifield of a need to ensure she rested adequately and decrease her physical activity, and that she might need to decrease her work. *Id.* He also sent Holfiield's blood for testing, which showed an elevated antibody presence. AR 58.

Dr. Kundargi noted that Holifield reported no improvement at a February 5, 2002 follow up visit, AR 51, and reported worsening cognitive defects at a March 30, 2002 follow up. AR 52. There is no record that he himself attempted to measure any change in cognitive ability. At the March 30 visit, Dr. Kundargi noted the possibility that, should her condition not improve, Holifield may need to have her work restricted. AR 52. On a June 26, 2002 visit, Dr. Kundargi again noted Holifield reported no improvement in her condition, but that she "realize[d] she might need to be off work." AR 53. On that visit, Dr. Kundargi recommended Holifield significantly limit her work activity for at least six months. However, he indicated that she may attend staff meetings two times a week, and sit for thirty to forty minutes at a time with ten minute movement intervals. *Id.* He recommended she return to work in a full capacity on January 6, 2003, and completed Unum and California Employment Development Department disability forms on her behalf. *Id.*

At a visit on August 8, 2002, Dr. Kundargi noted improvement and that Holifield reported that being off work left her less fatigued, in less pain, and with less cognitive deficits. AR 54. He noted continued improvement at a October 21, 2002 visit. AR 55. However, on January 6, 2003, just as she was scheduled to return to work, Dr. Kundargi noted that Holifield reported an increase in symptoms, including fatigue, headaches, depression, insomnia, and congnitive deficits. AR 56. He thus concluded that Holifield was still unable to return to work. *Id.* At that visit and at a subsequent March 2003 visit, he indicated that Holifield's symptoms were also worsened due to stress relating to her financial situation and the unresolved insurance claim. AR 57. In March 2003, he also began treating Holifield with the antidepressant Effexor. *Id.*

**Unum's Initial Medical Reviews by Nurse Ritchhart and Dr. Kile**

The records sent by Dr. Kundargi were initially reviewed by Pamela Ritchhart, a registered nurse employed by Unum, on April 1, 2003. Ritchhart noted the lack of any objective cognitive testing anywhere in the medical record, and the lack of discussion about Holifield's ability to function at home. AR 119. She also noted that Holifield's condition and treatment were stagnant for over a year, and that there had been no psychiatric referrals, evaluations, or treatment for Holifield's long present depression other than the addition of an antidepressant in March 2003. AR 119–20. Ritchhart concluded that, due to the lack of any clear evaluation of Holifield's functional level, a finding of total inability to work was not supported. AR 120.

The file was next reviewed by Unum Physician Dr. Debra Kile, who concurred with Ritchhart's assessment. Dr. Kile also found the lack of any mental health evaluation or treatment curious, particularly since mental health therapy has been found to improve functioning in patients

with CFS. *Id.* Dr. Kile also noted that there is no "literature" to support Dr. Kundargi's recommendation that Holifield stay off work for six months, and that there were no "clinical observations, physical exam findings, labs, diagnostic studies, or functional capacity evaluation to support no work capacity." *Id.* She noted that although Holifield complained of muscle and joint pain and headaches, Holifield was not taking any medications related to these symptoms, and there was no referral to an appropriate specialist. *Id.* Dr. Kile also noted that Holifield's self-reported symptoms and difficulty working would support "a few weeks off work or part-time work, while optimizing therapy, stabilize pain/headaches and initiate therapy," for up to six weeks. *Id.* But she concluded that Dr. Kundargi's recommendation of " 'at least 6 months off' is excessive and inadequately supported—and may be counterproductive causing further de-conditioning[4] & increased self-perception of disability." *Id.* In Dr. Kile's opinion, the "suboptimal" care and medical records did not "adequately support significant physical or cognitive impairment which would preclude return to work sedentary to light work activities." AR 121–22.

### The Initial Denial

After the initial round of review, on April 23, 2003, a Unum representative called Holifield and explained to her the results of the medical review and that the claim would be denied. AR 123. On this call, Holifield repeatedly indicated that Unum's physicians do not understand her illness, and that Dr. Kundargi is a specialist in treating CFS. AR 123. Later that day, the representative called Holifield again and explained the appeal process to

her, and indicated she would be faxing her the denial letter. AR 124.

Since Dr. Kile had concluded that the medical records only supported at most a six week period of work limitation, Unum indicated that there was "no documentation to support a disability beyond 9/4/02" and thus denied benefits. AR 132. Specifically, the denial letter noted "there are no physical or cognitive test results supporting a time frame of six months that would preclude you from performing your occupational duties in a sedentary capacity." AR 132. The letter provided details about the appeals process, providing the relevant deadlines and explaining that an independent review would be conducted by a different medical reviewer. The letter explained an appeal decision would be made within a maximum of 90 days. AR 133.

In late April and early May, 2003, there was a series of back and forth telephone calls between Holifield and Unum representatives, in which Holifield asked for more documentation regarding the denial of her claim, including the internal medical review referenced in the denial, and also indicating that she felt Unum still did not properly understand her condition or the information Dr. Kundargi had sent them. AR 136–140. A Unum representative indicated that she would attempt to schedule a "Doctor to Doctor" call so Dr. Kundargi could better explain Holifield's condition, but could not provide her with a copy of Dr. Kile's medical report at that time. AR 140. David Rib, a Vice President at Holifield's employer also spoke with Unum representatives, and the representatives explained the basis for the denial to him. AR 147. Rib mentioned that he knew that

---

**4.** Both parties and they physicians use the term "deconditioning" or "de-conditioning," although none define it. The Court thus takes judicial notice that deconditioning is defined as "[a] loss of physical fitness due to failure to maintain an optimal level of physical activity or training." "Deconditioning," *Tabers Cyclopedic Medical Dictionary* (2002).

Dr. Kundargi was "very difficult" with providing information to Unum, and that he knew Dr. Kundargi was "giving [Holifield] the run around." AR 147.

### The Doctor to Doctor Call

On May 15, 2003, Drs. Kile and Kundargi had a phone conversation. AR 149.[5] In that conversation, Dr. Kundargi acknowledged that the only evidence of Holifield's inability to work was her self-reports and her completed patient questionnaire. *Id.* However, he considered his own judgment accurate and dispositive, noting he has had a special practice interest in CFS since 1976, and patients from around the state come to see him. *Id.* He also noted that only 20% of his CFS patients are unable to return to work, but that he believed Holifield fell into this minority. *Id.*

Dr. Kundargi explained that he did not make any mental health referrals because he "feels strongly her primary problem is physical in nature." AR 149. He did agree with Dr. Kile, though, "that if Ms. Holifield had more aggressive treatment for her secondary depression that her level of function and work capacity could also potentially improve." *Id.*

Kundargi also noted that, upon physical examination of Holifield, he noted "fibromyalgia tender points" and anisocoria (unequal pupil size), which he often finds in CFS patients. AR 149–50. Dr. Kile, noted, however, that anisocoria is present in approximately 20% of the population. AR 150.

When asked to point to evidence as to why Holifield was unable to do sedentary to light· work, Dr. Kundargi simply explained that "he feels he 'can tell who is and who is not.'" AR 150. He also pointed to other stressors in Holifield's

life, including that she "is busy taking care of her daughter's baby," who was born in December 2002. When pressed, he admitted that from a physical standpoint, Holifield's "ability to help with the baby suggests at least some work capacity" and "agreed it was fair to say if Ms. Holifield did not have these family responsibilities she could possibly return to work." AR 150.

Dr. Kundargi also indicated that he had no plans for treating Holifield beyond her current treatment regimen of over-the-counter medications, anti-depressants, and rest. *Id.* He stated that if a patient continues to complain of limiting fatigue after six months off work, he feels there is "nothing much else he can do for them" and relies on their account of their inability to work. *Id.* In Ms. Holifield's case, he conceded there were no current plans to return to work, "in part because [of] Ms. Holifield's current home and family responsibilities." *Id.*

Dr. Kile indicated that her conversation with Dr. Kundargi did not change her medical opinion that the records were inadequate to establish an ongoing loss of work capacity such that would qualify Holifield for benefits under the policy. AR 151. Moreover, the additional information about Holifield's child-care responsibilities "appear[ed] contrary to loss of work capacity." *Id.* Kile continued to believe that a "more multidisciplinary approach to [Holifield's] condition as recommended by most experts and current scientific literature" could "be expected to improve level of function." AR 151.

### Administrative Appeal and Initial Review by Dr. Krell

In September and October, Holifield called Unum several times and asked the

---

**5.** Dr. Kile summarized the details of this conversation via letter sent to Dr. Kundargi on May 16, 2003, and asked Dr. Kundargi to return a signed copy agreeing that it was an accurate summary of their discussion, noting that if there was no response by June 1, 2003, it would be presumed he agreed. AR 153–155. Dr. Kundargi never responded.

status of her claim. Representatives explained that, after speaking with Dr. Kundargi, Unum's position remained the same, and that if she wanted to reopen the case, she would have to follow the appeal process prescribed in the April 2003 denial letter. AR 158–161.

On October 6, 2003, Holifield filed a written letter of appeal. AR 163–164. When an Unum representative spoke with Holifield on November 11, 2003, Holifield told her that she got a second opinion and would fax that information to Unum. She also said that Dr. Kundargi was going to submit a response to the letter summarizing the May 2003 phone call with Dr. Kine, sent to him six months earlier. AR 282. On November 18, 2003, Unum thus notified Holifield that it anticipated it would need a 45–day extension to make a decision on the appeal, so it could incorporate these additional documents into its review. AR 284. No further records were supplied to Unum by that time, however.

As part of the appeal process, Holifield's entire file was reviewed by Dr. Daniel Krell on November 21, 2003. AR 285. His review concluded that there was no specific support for restrictions and limitations on the basis of a physical condition, and that the record only could support a brief, six-week period of no work through August 8, 2002. AR 288. Specifically, Dr. Krell noted "the lack of recommended or prescribed interventions in response to the claimant's symptoms is not consistent with Dr. Kundargi's overly global and restrictive R & L's [restrictions and limitations], which have no support on the basis of an identifiable physical condition." Further, he noted that Dr. Kundargi's "use of anisocoria as a gauge of the claimant's condition may raise question [sic] about the credibility of the assessment of the claimant's condition and recommended responses (physical inactivity and withdrawl [sic] from normal activities). Such recommen-

dations would be expected to increase physical and psychosocial deconditioning, and, thus, represent barriers to improvement and RTW [return to work]." AR 288. Dr. Krell opined that Dr. Kundargi's treatment regimen of restricted physical and professional activity was actually counterproductive, "particularly in the absence of therapeutic interventions." The low "intensity of care," including only "non-standard use of antibiotics, vitamins, and food supplements" and reports of worsening symptoms despite Holifield being out of work was "not commensurate with symptoms and loss of capacity so severe that the claimant is unable to continue the activities in which she engaged prior to the DOD [date of diagnosis]." AR 288.

Holifield was informed of the decision to uphold the initial denial of her claim via letter on November 25, 2003. AR 290–296. In this letter, Unum explained that the lack of any testing or therapeutic interventions to decrease fatigue or depression; Holifield's apparent ability to perform activities of daily living, including routine care of her grandchild; Dr. Kundargi's questionable diagnostic tool; and the counterproductive treatment prescribed by Dr. Kundargi did not "substantiate physical restrictions and limitations that would prevent [her] from performomting the material and substantial duties of [her] regular occupation." AR 294.

In the denial letter, Unum explicitly cited the policy's "regular care" requirement, and noted that Dr. Kundargi did not appear to be providing "the most appropriate treatment and care for your disabling conditions," particularly by failing to make any neurological or mental health referrals. AR 295. Accordingly, Unum concluded that Holifield was "not receiving regular care for an impairing cognitive or emotional condition as defined by the policy." AR 295. The letter indicated it was

a final denial, and any further disputes could be brought either via an ERISA action or via review of the Californian Insurance Department. AR 295.

Upon receipt of the denial, Holifield contacted Unum on December 3, 2003, and claimed that Unum had failed to review all of her records, and said she was receiving treatment by a Dr. Tucker. Since Unum had never received any records from Dr. Tucker, or seen any mention of him at all, it agreed to allow Holifield thirty days to submit this additional information, and sent her written confirmation to this effect. AR 300, 302. Holifield then asked for a further extension since Dr. Kundargi was out of the country. AR 303. Unum granted Holifield an extension to submit additional information until January 31, 2004. AR 303, 305.

### Supplemental Information from Dr. Kundargi

On January 29, 2004, Dr. Kundargi sent two faxes to Unum, containing a variety of documents. First, Dr. Kundargi provided a letter largely repeating his earlier impressions and diagnosis, but adding that he had "reluctantly" referred Holifield for physical therapy and cognitive behavior modification after speaking with Dr. Kile in May 2003. AR 309. He said these treatments were unsuccessful and that physical therapy "made her more ill." AR 309. He also submitted a 1983 Workers Compensation Appeals Board decision from a case where he had "won" as a witness for several plaintiffs suffering from CFS.[6] AR 309, 379. He did not address the accuracy of Dr. Kile's report of the conversation.

Included with Dr. Kundargi's letter was a three-line note from a psychologist, Dr.

Tissen. The entirety of this note was as follows:

Karen Holyfield [sic] has experienced depression, [illegible], disrupted sleep, memory, concentration, organization difficulty. She feels "foggy" most of the time. She lacks motivation. She reports feeling unable to work at her current position. I concur.

AR 310. The note does not reference any psychological or neurological evaluation, or any treatment plan.

Dr. Kundargi's fax also included documents from a May 2003 physical therapy evaluation. AR 311–331. In that initial evaluation, the physical therapist recorded various measurements of Holifield's strengths and abilities, and noted that Holifield's potential for rehabilitation was "good," with short-term goals of decreasing fatigue by thirty to forty percent and increasing muscle strength, and long-term goals of minimizing fatigue and restoring good endurance in daily physical activities. AR 312. Holifield was to undergo treatment twice a week for four weeks, including strength and endurance training and a home exercise program. AR 312.

Next, the fax included a series of notes from Dr. Suman P. Thakker, who appears to be a psychiatrist who saw Holifield on May 5 and June 16, 2003. AR 372–374. Based on Holifield's self-reported history and a physical examination, Dr. Thakker came to the initial impression that Holifield suffered from chronic fatigue and polyarthralgia. Dr. Thakker recommended Holifield begin taking the antidepressant Celexa for both her depression and fatigue. AR 374. On June 16, Holifield indicated she had stopped taking the Celexa due to its sexual side effects. Dr. Thakker then gave her samples of another

---

**6.** The Court takes judicial notice of the fact that medical science and standards of treatment for all diseases have changed greatly since the late 1970s, the period at issue in the case provided, and thus does not rely on this decision at all.

prescription antidepressant, Wellbutrin, and told her to follow up with her primary care physician, Dr. Kundargi. AR 373.

This information was sent to Dr. Krell for review. AR 413.

### Dr. Krell's Second Review

Dr. Krell reviewed the supplemental materials on March 16, 2004, but the supplemental information did not change his opinion. With respect to the physical therapy records, he noted the evaluation showed normal to above-normal grip strengths and a heart rate lower than expected for "a person who is significantly deconditioned and in discomfort." Second, he noted that Holifield only attended two physical therapy sessions according to the documents provided. In terms of mental health and cognitive therapies, he noted there was no documentation of any formal evaluation, assessment, or treatment plan. While Dr. Krell noted that there was evidence of depression, there was no evidence of a severe, impairing depression such that would limit Holifield's functional capacity. AR 417.

Unum sent Holifield a letter on March 22, 2004, informing her that the supplemental information was insufficient to cause Unum to reverse its earlier determinations. AR 421–422. The letter specifically noted Dr. Krell's observations about Holifield's grip strength and heart rate, as well as the lack of any psychiatric or cognitive evaluations or treatment plans. AR 422.

## III. Evidence Outside the Administrative Record

Chronic fatigue syndrome is a controversial condition in many ways, and there is a particularly lively debate as to whether "there is a single cause or many causes and whether the cause is physical or psychologic."[7] Thus, as a sister court has recently noted, "CFS present[s] problems in the world of disability law; for plan administrators who have to determine the weight of a claimant's highly subjective symptoms, and for reviewing courts who ultimately pass over their judgment." *Linich v. Broadspire Servs., Inc.*, No. CV–05–2983–PHX–MHM, 2009 WL 775471, at *9 (D.Ariz. Mar. 23, 2009).

It is difficult for health care providers to diagnose CFS, as no specific laboratory tests or biomarkers exist.[8] There are also a large number of other, treatable illnesses that present with similar symptoms, including hypothyroidism, sleep apnea and narcolepsy, major depressive disorders, chronic mononucleosis, bipolar affective disorders, schizophrenia, eating disorders, cancer, autoimmune disease, hormonal disorders, subacute infections, obesity, alcohol or substance abuse, and reactions to prescribed medications.[9]

Nonetheless, there is a generally accepted International Case Definition which guides clinical diagnosis of patients presenting with fatigue. To meet this definition, a clinician must first evaluate a patient's symptoms via a patient history and physical examination, followed by exclusionary lab tests, and a full neurological and psychological evaluation.[10] If these

---

**7.** Chronic Fatigue Syndrome, *Merck Manual Home Edition* (2008), http://www.merck.com/mmhe/sec25/ch306/ch306b.html.

**8.** Centers for Disease Control, United States Public Health Service ("CDC"), "CFS Clinical Diagnosis," http://www.cdc.gov/cfs/cfsdiagnosisHCP.htm. Plaintiff has selectively quoted various CDC publications about CFS in her Trial Brief. *See* Pl.'s Trial Br. at 2. The Court finds it appropriate to take judicial notice of the full complement of CDC materials about CFS.

**9.** CDC, "CFS Basic Facts," http://www.cdc.gov/cfs/cfsbasicfacts.htm.

**10.** *Id.;* CDC, "Recognition and Management of Chronic Fatigue Syndrome," http://www.cdc.gov/cfs/pdf/HCPManaging.pdf. *See also Sobel v. Sun Life & Health Ins. Co., Inc.*, No. C 08–01682 WHA, 2008 WL 5170296, at *3–

tests produce no plausible explanation, and chronic fatigue has lasted greater than six months and significantly affects a patient's daily activities and work, a diagnosis of CFS is appropriate if a patient demonstrates four or more of the following eight symptoms:

(1) postexertional malaise lasting more than 24 hours

(2) unrefreshing sleep

(3) impaired memory or concentration

(4) muscle pain

(5) multijoint pain without redness or swelling

(6) headache

(7) tender cervical or axillary lymph nodes

(8) sore throat.[11]

The primary treatments for CFS target individual symptoms. For pain, therapy includes both traditional pain relief medications and nonpharmacological modalities, including stretching and movement therapies, massage, relaxation, heat and hydrotherapy, and acupuncture.[12] Where cognitive dysfunction is present, the recommended treatments include relaxation and meditation training, memory aids, and puzzles, games, and other mind-stimulating activities.[13] Where cognitive dysfunction is severe, though, the CDC warns primary care providers "that training to improve cognition is a highly specialized therapy and requires input of trained behavioral health clinicians."[14]

Depression is often present as a secondary disorder in CFS patients; when it appears to be present, the CDC recommends a referral to a mental health professional.[15] Other CFS symptoms are addressed pharmacologically, or with nutritional supplements, behavior modification, and alternative therapies including massage, yoga, meditation, and acupuncture.

Patients with CFS are urged neither to overexert themselves or to avoid all activity.[16] Even patients with CFS who are housebound or bedbound should engage in modified exercise in order to improve flexibility and minimize the impact of deconditioning.[17] For most patients, though, an individualized activity plan that includes a healthy and nutritious diet, graded activity and exercise, and a strengthening and conditioning program is appropriate to reduce fatigue and pain, improve strength and flexibility, and enhance stamina and function.[18] Energy management programs, either as a part of cognitive behavioral therapy or as a standalone, are also helpful for some CFS patients.[19]

## IV. Standard of Review

█ The parties agree that an abuse of discretion standard applies to the Court's review of Unum's denial. But where an entity both determines eligibility for benefits and pays benefits awards, the court must weigh this so-called "structural conflict of interest" as a factor in determining whether there was an abuse of discretion.

\*5 (N.D.Cal. Dec. 9, 2008) (discussing need for a neuropsychiatric examination to make a diagnosis of CFS).

11. CDC, "Recognition and Management of Chronic Fatigue Syndrome," *id.*

12. CDC, "Treatment Options," http://www.cdc.gov/cfs/cfstreatmentHCP.htm.

13. *Id.*

14. *Id.*

15. *Id.*

16. CDC, "CFS Toolkit for Health Care Professionals: Managing Activity," http://www.cdc.gov/cfs/pdf/Managing_Activity.pdf.

17. *Id.*

18. *Id.*

19. *Id.*

*Nolan v. Heald College,* 551 F.3d 1148, 1153 (9th Cir.2009), *citing Metropolitan Life Ins. Co. v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). But the conflict of interest is only one of "several different considerations" the Court is to take into account when evaluating the insurer's decision, *Glenn,* 128 S.Ct. at 2351, and what weight the conflict of interest has in determining how much deference the insurer's decision is afforded depends on the "nature, extent, and effect" the conflict has on the insurer's decision-making process. *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d at 970. The court is "to temper the abuse of discretion standard with skepticism 'commensurate' with the conflict." *Nolan,* 551 F.3d at 1153. Even in such conflict situations, though, some deference is still afforded to the insurer's decision. *Glenn* does not stand for the proposition that de novo review applies in all situations where the insurer has such a history. At bottom, even after *Glenn* and even where a conflict exists, the question is not whether the Court would have approved the claim for benefits. Rather, as the Seventh Circuit has recently explained, "[w]hen the case is borderline . . . the inherent conflict of interest that exists in so many of these situations can push it over the edge-towards a finding of capriciousness." *Jenkins v. Price Waterhouse Long Term Disability Plan,* 564 F.3d 856, 861–62 (7th Cir.2009).

## V. CONCLUSIONS OF LAW

### A. Plaintiff Has Not Shown that a Strong Weight Should Be Placed on the Conflict of Interest

Plaintiff makes two arguments as to why great weight should be placed on the conflict of interest here, and thus the abuse of discretion standard not applied. First, she

points to historical practices of Unum as to the treatment of "subjective illnesses" like hers. Second, she claims that the failure to provide her with a medical report when she requested was a violation of ERISA, and thus should shift the burden of proof.

Neither of these arguments are persuasive under the facts presented here or governing legal authority.

### 1. Plaintiff's Subjective Illness Does Not Entitle Her to a Strong Weight to Be Placed on the Conflict of Interest

Plaintiff argues that the conflict of interest here should prove of "great importance" because Unum has a history of biased administration of claims relating to subjective illnesses. In support of this contention, plaintiff points to a 2007 law review article about Unum's claims process, itself cited in *Glenn* to show an example of biased claim administration. Trial Br. at 16–17, *citing* John H. Langbein, *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials under ERISA,* 101 Nw. U.L.Rev. 1315 (2007), *cited in Glenn,* 128 S.Ct. at 2351. In particular, plaintiff notes Unum had a practice of denying valid claims for "subjective illnesses, illnesses that don't show up on x-rays or MRIs." *Id., citing* 101 Nw. U.L.Rev. at 1319. This practice included failing to request further information or suggest additional medical tests or to otherwise help the claimant perfect a claim for disability insurance benefits. *Id.*

The Administrative Record here, however, precludes the Court from placing any weight on such historical practice, as it contraindicates any of the bad faith practices Unum was accused of implementing in Langbein's article occurred here.[20]

**20.** Moreover, the Court agrees with the holding of the court in *Bartholomew v. Unum Life Ins. Co. of Am.,* 588 F.Supp.2d 1262, 1267

(W.D.Wash.2008), that that article is inadmissible hearsay evidence of administrative abuses by Unum. As the court there noted, it is

Unum contacted Holifield and Dr. Kundargi of its own volition at several times throughout the claims process, and at several times re-opened the claim or extended deadlines after Dr. Kundargi failed to respond to requests for records or otherwise failed to provide materials Holifield indicated were forthcoming. Holifield was allowed to provide supplemental information after her claim was initially denied, and then again after her appeal was initially denied. Each time that Holifield requested an extension or reopening of the claim to provide more information, Unum granted the extension. This flexibility on behalf of Unum in the instant case outweighs any historical bad faith practices.

▆ The fact that CFS is a "subjective illness," and thus part of the class of claims that Unum may have been biased in adjudicating, also has no import in and of itself. Plaintiff mistakenly focuses on the fact that there is no means to "objectively verify" the presence of CFS. *See, e.g.,* Trial Br. at 8 ("Unum did not rationalize that CFS, by definition, does not produce any objective test results."). It is an individual's ability to function, not simply their diagnosis, that entitles him or her to disability benefits. The Ninth Circuit has noted:

> That a person has a true medical diagnosis does not by itself establish disability. Medical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working. After a certain age, most people have pain, with or without palpation, in various parts of their body, and they often have other medical conditions. Sometimes their medical conditions are

so severe that they cannot work; sometimes people are able to work despite their conditions; and sometimes people work to distract themselves from their conditions. Physicians have various criteria, some objective, some not, for evaluating how severe pain is and whether it is so severe as to be disabling.

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 880 (9th Cir.2004), *abrogated in other part by Abatie, supra.*

The Administrative Record is clear that Unum did not reject Holifield's claim because it disputed that she suffered from CFS, but rather because it disputed the impact of CFS on her ability to work. As Dr. Kundargi has himself noted repeatedly, there is a broad range of patients with CFS. While there is no test for CFS, there are a variety of tests and evaluations designed to measure an individual's cognitive, psychological, and physical functioning, particularly in the areas of deficit that Holifield reported. As another court in this district has recently noted, "numerous Courts have concluded that an administrator does not abuse its discretion by requiring objective evidence of an inability to function in the workplace." *Seleine v. Fluor Corp. Long–Term Disability Plan,* 598 F.Supp.2d 1090, 1102 (C.D.Cal.2009), *citing Desrosiers v. Hartford Life & Accident Ins. Co.,* 515 F.3d 87 (1st Cir.2008); *Corry v. Liberty Life Assur. Co. of Boston,* 499 F.3d 389 (5th Cir.2007); *Johnson v. Metropolitan Life Ins. Co.,* 437 F.3d 809, 814 (8th Cir.2006); *Pralutsky v. Metropolitan Life Ins. Co.,* 435 F.3d 833, 839–40 (8th Cir.2006), *cert. denied,* 549 U.S. 887, 127 S.Ct. 264, 166 L.Ed.2d 151 (2006);

---

irrelevant that the Ninth Circuit and Supreme Court have cited that article, since "neither of those cases involved Unum as a defendant and that the opinions cited the article for illustrative (as opposed to probative) purposes...." *Id.* In association with her reply

brief, plaintiff has supplied exhibits detailing regulatory action against Unum. Since there is no evidence of misconduct in the case before the Court, and in fact evidence of extremely accommodating conduct, the Court finds these exhibits irrelevant.

*Kushner v. Lehigh Cement Co.,* 572 F.Supp.2d 1182, 1191–1192 (C.D.Cal.2008). Specifically, in the context of CFS, the *Linich* court recently noted:

> There is a world of difference between requiring Linich to prove the accuracy of her CFS or Fibromyalgia diagnosis with something like a simple blood test, which does not exist, and requiring Linich to submit additional evidence, objective or otherwise, in order to verify the severity of her symptoms. The latter would be proper a[sic] request, while the former would not.

2009 WL 775471 at *14. *See also Carder-Cowin v. Unum Life Ins. Co. of Am.,* 560 F.Supp.2d 1006, 1019 (W.D.Wash.2008) ("the fibromyalgia diagnosis in the IME [independent medical evaluation] alone is not dispositive because the examining physician concluded that despite this diagnosis plaintiff is not totally disabled.").

Thus, the fact that Unum sought objective evidence of the disabling *effects* of plaintiff's subjective illness does not indicate bad faith or improper conduct by Unum.

**2. Any Failure to Provide Copies of Relevant Information was Insufficient to Shift the Standard of Review**

■ Plaintiff claims that Unum violated ERISA by failing to provide her with copies of all relevant information upon request, thus denying her a full and fair review of her claim denial. Pl.'s Trial Br. at 18–19, *citing Glenn,* 128 S.Ct. at 2350, *citing* 29 U.S.C. § 1133. Specifically, she alleges Unum violated the statute when it failed to provide Holifield with a copy of Dr. Kile's medical report upon Holifield's request after the initial denial. AR 140.

Under 29 C.F.R. § 2560.503–1(h)(2)(iii), Department of Labor regulations adopted pursuant to 29 U.S.C. § 1133, Unum was required to provide Holifield "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." Unum disputes whether there was an actual violation of this provision, since it appears that, after a Unum representative told Holifield she could not get access to the sought-after records, plaintiff agreed to not "pursue requesting our [Unum's] file" at that time. Def.'s Resp. Trial Br. at 4; AR 140. The fact that Holifield did not continue to press her request for Dr. Kile's report at that time is not dispositive. Holifield explicitly requested the report, and the Unum representative explicitly stated that Unum "cannot release our claim file and the information contained in it." AR 140. This request and denial together show a violation of the regulation.

■ The regulatory violation, though, does not alter the Court's review in this case. "[P]rocedural violations of ERISA do not alter the standard of review unless those violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." *Gatti v. Reliance Standard Life Ins. Co.,* 415 F.3d 978 (9th Cir.2005) Post-*Abatie* and *Glenn,* courts have routinely continued to reject claims that noncompliance with procedural ERISA rules de facto establish heightened scrutiny of an administrative decision. *See, e.g., Barnes v. Unum Life Ins. Co. of Am.,* 621 F.Supp.2d 1097, 1102 (D.Or.2009), *citing Abatie,* 458 F.3d at 972 ("[M]inor procedural irregularities do not shift the standard of review from abuse of discretion to de novo."); *Mazet v. Halliburton Co. Long–Term Disability Plan,* No. CV–04–0493–PHX–FJM, 2008 WL 324281, at *1 (D.Ariz. Feb. 5, 2008) (holding *Gatti* applies post-*Abatie* ).

One isolated failure to provide a record like that involved here is appropriately considered a "minor" violation. In *Card-*

*er–Cowin,* 560 F.Supp.2d 1006, the claimant alleged Unum violated ERISA by failing to provide him with a copy of the summary plan description within ninety days of his enrollment. The court there refused to "give considerable weight to this procedural violation in its review for abuse of discretion because the record shows that Unum 'engaged in an ongoing, good faith exchange of information' with plaintiff and therefore 'the court should give the administrator's decision broad deference notwithstanding a minor irregularity.' " 560 F.Supp.2d at 1015, *quoting Abatie,* 458 F.3d at 972. *Compare Joas v. Reliance Standard Life Ins. Co.,* 621 F.Supp.2d 1001, 1008 (S.D.Cal.2007) ("tempering" standard of review where insurer failed to provide plaintiff with information about how it interpreted policy terms in other cases despite several written requests for documents), *aff'd by* Nos. 08–55284, 08–55813, 2009 WL 1416728 at *1 (9th Cir. May 21, 2009) (mem.disp.).

Here, there is no indication that the withholding of the full report had any effect on Unum's decision or Holifield's ability to challenge it. Dr. Kile's medical report contains no statements different from those shared with Holifield and her doctor as a result of the doctor-to-doctor call and subsequent memorialization thereof.

Because any violation of the governing regulations was harmless, and neither "wholesale" nor "flagrant," *Abatie,* 458 F.3d at 971, the Court finds the failure to provide the report when initially requested does not alter the standard of review. Accordingly, the Court refuses to place "great" or "strong" weight on the conflict of interest, and generally applies an abuse of discretion standard, while remaining cognizant of the conflict of interest under the "combination of factors" approach.

## B. Plaintiff Has Not Shown that Unum's Disability Determination Violated the Combination of Factors Abuse of Discretion Standard

Plaintiff's arguments that Unum's determination was improper, though overlapping, generally fall into two categories: (1) Unum failed to "engage in meaningful dialogue" as required by ERISA; and (2) Unum abused its discretion by failing to rely on her treating providers' opinions and conclusions.

Neither argument is persuasive, as the Court concludes Unum's decision was adequately supported by the record.

### 1. Unum Met Its Duty to Engage in a Meaningful Dialogue by Advising Plaintiff of the Issues with Her Claim

█ Plaintiff argues that Unum violated ERISA by failing to engage in a "meaningful dialogue," as it did not advise her as to how to perfect her claim and sent her an "uninformative" denial letter. Pl.'s Trial Br. 20–21. Plaintiff points to language in the April 25, 2003 denial letter that stated "Based on the current information in our claim file, and our review of the medical information there is no documentation to support a disability beyond 9/4/02." AR 132. Plaintiff accurately notes that similar language was deemed uninformative and insufficient to initiate "meaningful dialogue" in *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 870 (9th Cir.2008). However, in the letter sent to plaintiff by Unum, the quoted language was immediately followed by a more detailed explanation:

> The medical records in [sic] file document that your treating physician advised you to be off work for a six month period. There are no physical or cognitive test results supporting a time frame of six months that would preclude you

from performing your occupational duties in a sedentary capacity.

AR 132. This language clearly communicates the reason for the denial: Unum found there was no objective evidence to show that Holifield had any physical or cognitive disability that would preclude her from performing her job.

The notion that Unum failed to inform Holifield of the flaws in her claim is further contradicted by the administrative record. Unum gave Holifield and Dr. Kundargi several extensions specifically to provide the requested medical records. After the claim was initially denied, Unum reevaluated the claim after Dr. Kile spoke with Dr. Kundargi specifically about what was lacking in the medical records: any record of psychological or neurological evaluation, a comprehensive treatment plan, or any physical therapy/activity plan.[21] Dr. Kundargi and Holifield were then provided the opportunity to submit this evidence, which they failed to do as part of their appeal. After the appeal was first denied, Unum allowed Holifield and Dr. Kundargi to once again submit supplemental evidence, which they had failed to provide before the appeal was considered. Unum's continued calling and inquiries as to the status of requested records, the phone call of Dr. Kile to Dr. Kundargi, and its repeated acceptance of supplemental information all indicate that Unum met its duty to engage in a meaningful dialogue. *See Bartholomew v. Unum Life Ins. Co. of Am.*, 588 F.Supp.2d 1262, 1271 (W.D.Wash.2008) (finding meaningful dialogue existed on similar facts).

Plaintiff also argues that she has shown a failure to engage in a meaningful dialogue via a contradiction between Dr. Kile and Dr. Krell noting that a six week absence from work would be supported by the record, but a greater period of disability was not supported by the same evidence. Pl.'s Trial Br. at 25. In the context of Dr. Kile's and Dr. Krell's reports, this is hardly contradictory or irrational. Drs. Kile and Krell rationally concluded it would be acceptable to have a patient take a short break from work to see if her symptoms improved, but was irrational to, once those symptoms did not dissipate after six weeks of no work, maintain the same course of treatment of over-the-counter drugs and no work, especially in light of their stated concerns about deconditioning.

The Court thus concludes Unum met its duty to engage in a meaningful dialogue.

**2. Unum was Entitled to Reject the Opinions Contained in the Original and Supplemental Information Provided by Dr. Kundargi and Conclude There Was Insufficient Evidence of Disability and that Holifield was Not Receiving "Regular Care"**

The majority of Holifield's briefs focus on variations on the argument that Unum was required to give deference to her treating providers' opinions and failed to do so. Holifield claims "consistent findings of three medical professionals that Ms. Holifield continuously suffered from symptoms which are known to be disabling must be accepted." Pl.'s Trial Br. at 25. This position is not supported by the law, as discussed below, or the record, which does not show "findings" by medical professionals as much as mere recordings of Holifield's own complaints. Moreover, the *symptoms* described by Holifield and noted by her doctors—fatigue, muscle soreness, depression, cognitive deficits, memo-

---

**21.** The Court notes that these three items are all part of a standard treatment protocol for a CFS patient with Holifield's symptoms, according to the CDC publications to which plaintiff cited. *See, e.g.*, CDC, "CFS Toolkit for Health Care Professionals: Managing Activity," http:// www.cdc.gov/cfs/pdf/Managing_Activity.pdf.

ry loss, and anxiety—are all stated in broad terms which can demonstrate a great range in severity. The mere presence of these symptoms does not establish a total inability to work for a period of six months, as Dr. Kundargi concluded. As discussed below, there are significant inadequacies and problems with the record created by Holifield and her physicians, and Unum acted within its discretion in finding the materials insufficient to establish a disability.

### a. The Treating Physician Rule

■ As a preliminary matter, the Court addresses Holifield's contention that Unum was *required* to give deference to her providers' conclusions. ERISA plan administrators are not required to accord special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Plaintiff nonetheless claims that Unum voluntarily adopted a "treating physician rule" here, and is thus obliged to give deference to Holifield's treating physicians. Pl.'s Trial Br. at 23.

Unum disputes that it adopted such a rule, and the Court finds that plaintiff has failed to produce evidence to show that such a rule was in effect. In her brief, plaintiff cites to page 541 of the administrative record to demonstrate this fact. However, there are only 459 pages of the administrative record submitted to the Court. Unum explains that plaintiff is actually referring to a claims manual, not part of the administrative record, that was effective in early 2003, and based on now-invalid Ninth Circuit precedent that required ERISA plan administrators to apply a treating physician rule. Def.'s Resp. Trial Br. at 8.

Moreover, even if that claims manual were in effect in this case, for at least the second time it appears plaintiff has failed to quote a complete sentence and thus misrepresented the content of a document to the Court. In plaintiff's brief, she indicates that Unum's policy was that "the claims decision must conform to the procedure of giving 'deference to the opinion of a treating physician (attending physician) over the opinion of an examining physician unless it is inconsistent with substantial evidence in the case record (claim file).'" Pl.'s Trial Br. at 23. The quoted language does not come from Unum's description of its own policy, but rather from a description of social security procedure. The full sentence is as follows:

> In Social Security cases, the treating physician rule requires an administrative law judge to give deference to deference to the opinion of a treating physician (attending physician) over the opinion of an examining physician unless it is inconsistent with substantial evidence in the case record (claim file).

Def.'s Resp. Br. at 9. The only statement about *Unum's* use of the treating physician rule was as follows:

> Our current policies and procedures for documenting medical information conform to the standards of the treating physician rule: all decisions that are based on medical information—including non-compensable claim decisions—are documented in a complete manner.

*Id.* The meaning of this statement is unclear as to whether Unum is adopting the treating physician rule's substantive deference, or simply noting that it will document any rejection of a treating physician's opinion "in a complete manner."

■ But even had Unum adopted the treating physician rule does apply, it would not be required to give absolute deference to the opinions and conclusions of the treating physician. "Under ERISA, an administrator is not free to accept a conclusion in a medical report without considering whether that conclusion follows

logically from the underlying medical evidence." *Seleine v. Fluor Corp. Long–Term Disability Plan,* 598 F.Supp.2d 1090, 1101 (C.D.Cal.2009). As the Ninth Circuit has explained in the social security context, where the treating physician rule applies, a treating physician's opinions may be rejected "for 'clear and convincing' reasons supported by substantial evidence in the record." *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir.2007). Such reasons include where a treating physician's opinion is "in the form of a checklist, did not have supportive objective evidence, [or] was contradicted by other statements and assessments of [the patient]'s medical condition." *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir.2004). *See also Tuttle v. Standard Ins. Co.,* 459 F.Supp.2d 1063, 1072 (W.D.Wash.2006) (noting insurer "was not required to give special weight to [claimant's] treating physicians, particularly where their opinions were mere unsupported conclusions"). Here, there are several indicia of unreliability or a lack of support in the opinions of Holifield's treating providers which would allow Unum to reject those opinions.

#### b. Dr. Kundargi's Evaluations and Conclusions

Although plaintiff consistently refers to Dr. Kundargi as an expert in treating CFS, the only evidence to support this label is Dr. Kundargi's own statements that he has had a longstanding clinical interest in treating CFS, and his submission of a 1983 case in which he served as an expert. But even if he were an expert, both Unum and the Court are entitled to subject Dr. Kundargi's submissions to scrutiny for their rationality and support in generally-accepted practices.

■ First, the Court must again address Holifield's repeated, irrelevant argument that CFS is not diagnosable by any objective test. Unum did not dispute the diagnosis of CFS, but rather cited the lack of objective evidence to show that CFS caused Holifield to be completely unable to work and found that she was not receiving regular appropriate care. As the *Linich* court noted, "A plan administrator does not act unreasonably by requiring a plaintiff to submit additional evidence for the purpose of determining whether symptoms of an inherently subjective disease, such as CFS or Fibromyalgia, have manifested in such a way as to render the claimant disabled, and the district court should not be in the habit of substituting its own judgment for that of plan administrators." 2009 WL 775471 at *14. Unum thus did not abuse its discretion simply by seeking objective evidence of the purported effects of Holifield's illness.

Plaintiff also again makes a related flawed argument based on the claim that Dr. Kundargi determined "Ms. Holifield was disabled [ ] based on a diagnosis of CFS that conformed with the CDC criteria for diagnosing CFS." Pl.'s Br. at 24. First, a mere diagnosis of CFS is not equivalent to a determination of disability, as discussed at length above. Second, even though Unum does not challenge the diagnosis of CFS, Dr. Kundargi's diagnosis *did not* conform with the CDC criteria discussed above. As Drs. Krell and Kile both noted, Dr. Kundargi's diagnostic methods—relying on his "gut" and anisocoria—are not supported by standard clinical practice guidelines. Despite complaints of cognitive difficulties and depression, Dr. Kundargi did not make any referral to a psychological or neurological evaluation before making his diagnosis. He provided no reason for refusing to evaluate possible psychological or neurological causes of Holifield's symptoms, even though this is a clear step in the clinically accepted diagnosis process, other than that "he believed her problem

was physical." Such an unsupported assertion is not one that requires deference and allowed Unum to question Dr. Kundargi's ultimate conclusion.

Examining the treatment provided by Dr. Kundargi, Unum was entitled to find that Dr. Kundargi's care did not comply with the standards of regular care provided for in the policy. Plaintiff notes that all of the specific treatments that Dr. Kundargi did prescribe "are proffered by the CDC as possible treatments of CFS." Pl.'s Trial Br. at 24, n. 7. This is technically true, as they are all *part* of appropriate treatment, but more important is the treatment that Holifield *did not* receive, an issue made clear by Unum in its denials and in its internal medical reviews. According to the same CDC literature plaintiff cites, discussed above, all patients should be engaged in some sort of strength conditioning or other physical activity. Dr. Kundargi did not make any such recommendation until Unum's Dr. Kile raised the issue, and even then, the treatment was brief and prematurely terminated. Moreover, Dr. Kundargi has effectively conceded that he has "given up" on plaintiff; he has stated that once a patient fails to improve after six months of not working, there is "nothing much else he can do for them." AR 150. But plaintiff or Dr. Kundargi are unable to point to any evidence that suggests bimonthly doctor's visits with no ancillary services and no work at all is an appropriate treatment for CFS, and there is no requirement that Unum accept Dr. Kundargi's conclusion that "nothing" is the appropriate treatment at this point, and this thus constitutes "regular care" under the policy.

Most importantly, Dr. Kundargi also called his own conclusions as to the disabling effects of Holifield's CFS into question when he "agreed it was fair to say if Ms. Holifield did not have these family responsibilities [of caring for an infant] she could possibly return to work." AR 150. In the context of Dr. Kundargi's other unsupported statements as to Holifield's ability to work, Unum was not required to disregard this information in making its determination. Holifield argues that Unum did not have sufficient information about the degree of her family responsibilities to conclude they were inconsistent with a finding of disability due to CFS. However, it was Dr. Kundargi, not anyone at Unum, who stated that Holifield's home responsibilities were at least partially responsible for her inability to work, and that "from [a] physical standpoint her ability to routinely help with the baby suggests at least some work capacity." AR 159.[22] While not alone sufficient to prove that Holifield was not disabled, Unum could consider this both as part of its evaluation of Dr. Kundargi's credibility, as evidence of an ability to perform other activities, and as evidence that any inability to work was caused by factors other than her CFS. *See Seleine*, 598 F.Supp.2d at 1102 (considering evidence of other light activities as inconsistent with claims of severe and debilitating pain).

In light of these significant problems with the information Dr. Kundargi provided, it was not an abuse of discretion for Unum to disagree with his ultimate conclusion as to the severity of plaintiff's disability and her total inability to work.

### c. Evidence from Other Providers

Holifield also argues that Unum abused its discretion in failing to give deference to the opinions of two mental health providers and by inaccurately concluding that Holifield failed to undergo a mental

---

**22.** While these statements come from Dr. Kile's summary of the call, Dr. Kundargi was given the opportunity to dispute the accuracy of the summary and never did. As such, Unum was entitled to rely on Dr. Kile's report of the call as accurate.

health evaluation and participate in physical therapy. During the appeals process, Holifield did submit documentation from mental health and physical therapy providers. This documentation, however, did not address the concerns set forth by Unum, and Unum was entitled to disagree with the conclusions therein. Examining the evidence of such treatments, however, Unum was entitled to conclude that any attempt at this treatment was insufficient.

### Mental Health Evaluation and Treatment

Plaintiff visited both a psychiatrist, Dr. Thekkar, and a psychologist, Dr. Tissen. Neither conducted any cognitive or psychological evaluations.[23] Rather, they simply recited Holifield's self-reported symptoms. The record does not show any sustained attempt at mental health treatment, but merely two visits to a psychiatrist and one visit to a psychologist, neither of whom conducted a cognitive evaluation, despite Holifield's claimed cognitive difficulties. Antidepressants were prescribed and discontinued at the patient's own exercise due to her dissatisfaction with side effects. These encounters are not evidence that Unum arbitrarily rejected evidence of either an inability to work or regular care. While the Court agrees with Holifield that these factors de facto establish that Holifield was not disabled, it concludes that these factors were sufficient to allow Unum to make the conclusion that Holifield did not suffer from a severe inability to work as she claimed.

Plaintiff's contention that there was the equivalent of a "psychological evaluation" by Dr. Tissen, by which "Dr. Tissen found Ms. Holifield to be in a mental fog, with memory, concentration, and organizational difficulties," Def.'s Resp. Trial Br. at 16, is a misrepresentation of Dr. Tissen's note and unsupported by the record. While Dr. Tissen noted he "concurred" with Ms. Holifield's self-reported inability to work at her own job, he provided no explanation for his concurrence, and his entire report was three sentences long. Unum was entitled to disregard this entirely perfunctory report. *See, e.g., Jordan,* 370 F.3d at 880 (finding it appropriate for insurer to discount "terse statements such as Dr. O'Connor's 'under her current state of affairs, she is medically disabled from her job as a secretary'"). There are many commonly used psychological and neurological assessment tools for evaluating memory, concentration, and organizational difficulties; none were used here. *Compare Barteau v. Prudential Ins. Co. of Am.,* No. Civ. 08–02733–RSL, 2009 WL 1505193, at *7–12 (C.D.Cal. May 26, 2009) (summarizing variety of neuropsychological evaluations and tests to determine whether chronic pain affected claimant's cognitive and physical functioning); *Salomaa v. Honda Long Term Disability Plan,* 542 F.Supp.2d 1068, 1080–81

---

23. Plaintiff says "at no time had Unum informed Ms. Holifield that Unum believed full neuropsychological or psychiatric evaluations were necessary for it to evaluate her claim." Pl.'s Trial Br. at 22. However, the initial denial letter on April 25, 2003 explicitly noted the lack of any "cognitive test results" supporting Dr. Kundargi's conclusions. AR 132. Dr. Kile's memorialization of the doctor-to-doctor phone call included a discussion of psychological testing and the lack of any such testing in this case. AR 153. Moreover, there is a distinction between specifying that testing was "necessary to evaluate the claim," a proposition Unum does not make at this juncture, and noting the lack of any testing to show that Holifield's care departed from standards and to show a lack of any objective evidence to support a claim of cognitive and/or psychological impairment. Both Holifield and Dr. Kundargi, were clearly on notice from the preliminary stages of her claim that Unum found the lack of *any* neuropsychological or psychiatric evaluations to be problematic.

(C.D.Cal.2008) (discussing formal neuropsychological evaluation of functioning of claimant with CFS); *Kuhn v. UnumProvident Corp.,* No. CV 04–368–TUC–DCB, 2006 WL 2766163 at *9 (D.Ariz. Sept. 25, 2006) (discussing neurological tests performed on claimant with fibromyalgia). As such, Unum acted within its discretion in finding that no sufficient cognitive or psychological evaluation was performed in spite of its numerous statements that the lack of such an evaluation was an obstacle to Holifield's claim.

Plaintiff's "treatment" by psychiatrist Dr. Thakker similarly does little to establish plaintiff's disability. Holifield concedes that "Dr. Thakker did not expressly opine on the disabling severity of Ms. Holifield's symptoms," but argues that "he did report the presence of the same symptoms Drs. Kundargi and Tissen deemed disabling." Pl.'s Br. at 24. The fact that Dr. Thakker noted the same self-reported symptoms as Dr. Kundargi is irrelevant. As the *Seleine* court noted, "Treating physicians are more or less required to accept the representations of their patients, but ... an ERISA administrator[] is not obligated to do so." 598 F.Supp.2d at 1102. Dr. Thakker did not make any conclusions about Holifield's ability to work, either with or without the assistance of behavioral therapy or antidepressants, nor could he reasonably be expected to on the basis of two appointments. When Holifield indicated she had decided to discontinue the antidepressants Dr. Thakker had prescribed, Dr. Thakker's sole response was to "give her some samples" and refer her back to Dr. Kundargi. This is not indicative of any real attempt to treat Holifield's psychological symptoms or evaluate the impact of these symptoms. The lack of real mental health treatment is particularly relevant to a disability claim for CFS, since CFS is a diagnosis of exclusion, as discussed in detail above. Moreover, neither Dr. Thakker or Dr. Tissen ever addressed the cognitive defects that made up a major part of Holifield's inability to work. While there is certainly debate over the accuracy and usefulness of competing cognitive assessment tools, here, *no* attempt was made to assess or treat Holifield's complaint of deficits cognitive functioning. There was also no evidence of any sustained attempt to treat the depression and anxiety that accompanied Holifield's pain and fatigue. Accordingly, Unum did not abuse its discretion by failing to consider Dr. Thakker's notes as evidence of an inability to work or regular care.

### Physical Therapy and Treatment

Plaintiff also argues that, contrary to Unum's assertions, she did undergo graded exercise physical therapy. Def.'s Resp. Br. at 17. Unum's assertion that plaintiff did not actually complete such therapy is not indicative of an abuse of discretion in light of the fact that, despite a positive physical therapy prognosis, Plaintiff ceased attending physical therapy after only two visits, before any real therapeutic benefit could accrue. The sole explanation for why such therapy stopped is Dr. Kundargi's letter to Unum, which notes that the therapy made her "feel ill." AR 309. There is no evidence that Dr. Kundargi or Holifield ever discussed this issue with the physical therapist before ceasing treatment or how exactly the physical treatment made her more "ill" than her already completely incapacitated state.

Plaintiff argues that the physical therapist's documentation of "general deconditioning" of her upper body muscle groups and short endurance are evidence of her disability. Pl.'s Trial Br. at 24; AR 335. Unum could rationally find this does not speak to the disabling effect of CFS for two major reasons. First, this evaluation was conducted in May 2003. It was the position of Unum's doctors that Dr. Kun-

dargi's recommendation of complete work stoppage would cause such deconditioning. The presence of deconditioning after ten months of no work, with no physical therapy or strength training actually supports Unum's doctors beliefs that Dr. Kundargi's recommended course of treatment was inappropriate, and does not show that CFS caused an inability to work. Deconditioning is by definition caused by a lack of physical activity, as noted above; any claimant who does not engage in physical activity for such a period of time can expect deconditioning, regardless of the absence or presence of a disabling condition. Second, the physical therapy evaluation also included findings inconsistent with a finding of severe disability, as noted by Dr. Krell.

Nothing in the physical therapy documents indicate Unum's coverage denial was an abuse of discretion. Rather, the finding of deconditioning, a positive prognosis, and a halt in treatment support Unum's decision.

## VI. CONCLUSION

Plaintiff repeatedly accuses Unum of "inaccurate claims processing." However, the administrative record is entirely devoid of any inaccurate processing by Unum, and in fact suggests that Unum provided Holifield and her treating physicians more than adequate opportunities to provide information showing that her CFS caused her to be incapable of performing her job, and that she was receiving appropriate regular care.

Given the ephemereal nature of a CFS diagnosis, Unum is entitled to peer beyond a patient's self-report of symptoms of generalized pain and fatigue before deeming an individual completely and utterly unable to work. There is no evidence other than the patient's self-reports of symptoms so severe that they would totally preclude her from working. The record before the Court is similar to that before the Ninth Circuit in *Jordan*. There, the court considered a claimant with fibromyalgia, which, like CFS, is of unknown origin, is not diagnosable via any test, and consists of a variety of symptoms which can range greatly in severity. The court's analysis is instructive:

The administrator acknowledged that Jordan had been diagnosed as having fibromyalgia and did not dispute that Jordan had the condition, or demand objective evidence that she had it. Rather, the administrator asked for evidence that the fibromyalgia she suffered from disabled her from working at her job. MetLife's letter to her doctors acknowledged their diagnosis of fibromyalgia, and asked "based on her diagnosis … what prevented your patient from performing her occupation" and also asked "what objective findings prevented her from performing sedentary work." If Jordan's physicians believed that the effects of her fibromyalgia disabled her from performing her occupation, those medical experts could have responded to the administrator's request for further information with at least some answer explaining why the illness prevented Jordan from performing her work as a secretary. However, Drs. Reddy and O'Connor merely reiterated their conclusory findings of disability. They did not answer the quite reasonable inquiry of the administrator. MetLife wrote in its final denial "[t]he record on hand shows you have been diagnosed with fibromyalgia, anxiety and depression. The documentation does not support an ongoing disability due to a mental/nervous condition or diagnosis." That is not a judgment that she did not have fibromyalgia. It is a judgment that, although she had been diagnosed as having fibromyalgia, the record the administrator had did not show that she was unable to work because of it.

370 F.3d at 877. For the reasons discussed above, the Court finds the reasoning applied by the *Jordan* court applies equally here, and that the intervening case law does not alter this analysis.

When combined with the questionable treatment (or lack thereof) by Dr. Kundargi, who seems content to let Holifield continue to decondition and has essentially given up on her treatment, the lack of compliance with physical and mental health therapies, and the evidence that she is regularly involved with the care of an infant child, the Court cannot find that Unum abused its discretion, even in light of the structural conflict of interest, in determining that Holifield had not shown she was disabled under the terms of the policy. While Dr. Kundargi may be content to accept the fact that "there is nothing else" to be done to help ameliorate Holifield's condition with the hope that some day she may improve, Unum is not required to accept this as an inevitable conclusion given the various treatments that were inadequately explored.

Accordingly, judgment is entered in favor of Unum. Each side is to bear its own costs.